UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                          Chapter 11

ODYSSEY PROPERTIES III, LLC,                    Case No. 8:10-bk-18713-CPM
et al.,

                                                (Jointly Administered with cases
        Debtors.                                8:10-bk-18715-CPM; 8:10-bk-18718-CPM;
                                                8:10-bk-18719-CPM; 8:10-bk-18720-CPM;
                                                8:10-bk-18721-CPM; 8:10-bk-18723-CPM;
                                                8:10-bk-18725-CPM; 8:10-bk-18728-CPM;
                                                and 8:10-bk-18730-CPM)
_____/                ***Emergency Relief Requested***


**DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO
OBTAIN POSTPETITION FINANCING AND GRANT SENIOR LIENS,
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND ADEQUATE
PROTECTION PURSUANT TO 11 U.S.C. §§ 364(c) AND (d) AND F.R.B.P. 4001**


**STATEMENT OF RELIEF REQUESTED**

The Debtors seek authority to borrow money, pursuant to a revolving credit facility, in order to fund the costs of certain tenant improvements and to pay their operating expenses and the costs of administration in these Chapter 11 cases, in accordance with the proposed budget attached hereto. The liens are proposed to be granted solely with respect to funds advanced for certain tenant improvements and would be senior liens on all such tenant improvements. This Motion seeks to have the liens granted pursuant to any financing approved by this Court to be deemed perfected without the need for any further filings. The principal terms of the revolving credit facility are set forth in Paragraph 26 of this Motion.


**Introduction**

Odyssey Properties III, LLC, Odyssey (III) DP XI, LLC, Odyssey (III) DP XVII, LLC,

Century (III) DP III, LLC, Odyssey (III) DP III, LLC, Century/AG – Avondale, LLC, Paradise

Shoppes at Apollo Beach, LLC, CRF-Panther IX, LLC, GPP – Cobb, LLC, and Walden Woods III,

Ltd., as debtors and debtors in possession (hereinafter referred to as the "**Debtors**"), by and through

their undersigned counsel, hereby file their Emergency Motion for Authority to Obtain Postpetition

Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001 (the "**Motion**"), and respectfully request that this Court enter an order, inter alia:

(A)     Authorizing the Debtors to borrow on a secured and non-secured basis from OC DIP, LLC, a Florida limited liability company (the "**DIP Lender**"), the principal amount of up to $2,900,000.00 (the "**DIP Facility**"), substantially in accordance with the terms of this Motion and the Term Sheet attached hereto as Exhibit A (the "**Term Sheet**");[1]

(B)     Authorizing the Debtors to execute one or more promissory notes and security agreements in favor of the DIP Lender, which shall be consistent with the provisions of this Motion and the Term Sheet (the "**DIP Loan Documents**"), and such other documents, instruments and agreements and perform all such other acts as may be required in connection with the DIP Loan Documents;[2]

(C)     Authorizing the Debtors, under Section 364 of the Bankruptcy Code, to obtain postpetition financing and incur postpetition indebtedness under the DIP Facility, a portion of which financing and indebtedness due and owing by the Debtors to the DIP Lender shall be secured by liens on and security interests in all Tenant Improvements (as defined below in this Motion) of the Debtor pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, which liens and security interests shall be senior to all prepetition and postpetition liens of third parties (including the

---

[1]     At the initial hearing on this Motion, the Debtors will seek to borrow up to $50,000 or such other amount as is necessary to avoid immediate and irreparable harm on an interim basis pending entry of a final order on this Motion.

[2]     At the present time, the Debtors anticipate that the DIP Lender will only require a promissory note and a security agreement to be executed at the closing of the DIP Facility, which promissory note and security agreement will contain the principal business terms of the DIP Facility as approved by this Court. At the request of the DIP Lender, the Debtors will also execute one or more UCC-1 financing statements for recording in the appropriate jurisdictions.

Lenders, as defined below) on property of the Debtors;

(D)     Authorizing the Debtors to grant to the DIP Lender, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim having priority over any and all administrative expenses of and priority claims against the Debtors, subject only to the Carve-Out, as further described in this Motion;

(E)     Modifying and, to the extent necessary, lifting the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lender and the Debtors to implement the terms of this Motion; and

(F)     Granting the Debtors such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Motion.

## Jurisdiction

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought herein include Sections 105, 361, 362, 363, 364 and 545 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## Background

2.     On August 2, 2010, (the "**Petition Date**"), the Debtors filed with this Court their Voluntary Petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

3.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4. Pursuant to an order of this court dated August 3, 2010, the Debtors' Chapter 11 cases are being jointly administered for procedural purposes only under In re: Odyssey Properties III, LLC, Case No. 8:10-bk-18713-CPM.

5. No previous application for the relief sought herein has been made by the Debtors to this Court or any other court.

6. No trustee or examiner has been appointed in these cases and no official committees have yet been appointed pursuant to Section 1102 of the Bankruptcy Code.

A.   *Description of Debtors' Businesses*

7. The Debtors are engaged in the business of developing, owning, and operating commercial properties, including anchored and unanchored retail centers, office buildings, flex and warehouse space, and self-storage centers, primarily in central Florida. They are affiliates of Century Realty Funds, Inc., which is part of the Century Realty Funds Group (the "**CRF Group**") of privately held companies. The CRF Group has been in business since the 1970s and owns and manages commercial retail centers and office buildings, self-storage facilities, over 1,000 residential apartment units, over 7,500 manufactured home and recreational vehicle spaces, and 18 skilled health care facilities consisting of over 1,500 beds.

8. One facet of the CRF Group's operations is a group of entities doing business under the umbrella of the "Odyssey" name – denominated, for example, "Odyssey Operating Partnership, Ltd.", "Odyssey Operating Partnership II, Ltd.", "Odyssey Residential, Inc.," and so forth. The first of the Odyssey entities began doing business in 2005. The Odyssey entities engaged in the commercial real estate business collectively own and operate approximately sixty-two (62) projects (each, including the property owned by Walden Woods, III, Ltd., is sometimes referred to herein as a

4

"**Project**").[3] Each Project is owned by a separate, special purpose limited liability company or partnership. Each Project is encumbered by first mortgage secured debt. A brief description of the business of each Debtor is set forth below:

Odyssey Properties III, LLC. Odyssey Properties III, LLC ("**Odyssey III**") was formed in 2006 to acquire existing, and to develop new, commercial properties, including anchored and unanchored retail centers, office buildings, flex and warehouse space, and self-storage centers. It currently owns interests in approximately eleven special purpose entities that were formed to own certain Projects. As further discussed below in this Motion, Odyssey III initially funded the completion of the Projects with Project-specific first mortgage loans from banks (often personally guaranteed by one or more individuals or entities), with approximately $29 million in proceeds raised through a private offering of notes by Odyssey III (the "**Investor Notes**"),[4] and with the proceeds of loans from the CRF Group. Additional funding has been provided by the CRF Group over the past several years to permit continuation of interest payments on the Investor Notes and to supplement cash flow in connection with operating expenses or loan payments on Project loans.

Four other Debtors, Odyssey (III) DP XI, LLC, Odyssey (III) DP XVII, LLC, Odyssey (III) DP III, LLC, and Century (III) DP III, LLC, are wholly owned subsidiaries of Odyssey III. Additionally, Odyssey III owns 35% of Century/AG-Avondale, LLC, also a Debtor. Not all of the special purpose entities owned by Odyssey III have filed Chapter 11 petitions at this time. In general, if Odyssey III and the specific Project-owning entities have been able to make, during the course of

---

[3]    With the exception of Walden Woods III, Ltd., the Debtors are "Odyssey entities." Walden Woods III, Ltd. is part of the CRF Group.

[4]    The other Odyssey entities also issued notes or raised capital to fund the Projects indirectly owned by them. CRF funded investments in Walden Woods III, Ltd. Three different Odyssey entities funded Century/AG-Avondale, LLC.

out-of-court negotiations, suitable arrangements with the mortgage holders on the Project (or if such negotiations are ongoing), Odyssey III has elected at this time to avoid the cost and expense of including those Projects in the Chapter 11 cases.

Odyssey (III) DP XI, LLC. Odyssey (III) DP XI, LLC owns and operates Alexander Crossings, a 44,674 square foot retail and office complex also containing a 0.85 acre partially developed outparcel, located in Plant City, Florida. Alexander Crossings is located at the intersection of Alexander Crossings and U.S. Highway 39, a major retail hub of Plant City which is home to a Wal-Mart Supercenter Retail, Staples, Publix Supermarket, Bealls, SweetBay Supermarket and Panera Bread, among others. The shopping center's current tenants include Watson Clinic, LLP, the Childrens Board of Hillsborough County, Plant City Dental, Physician's Weight Loss, and Plant City Learning Center, among others.

Odyssey (III) DP XVII, LLC. Odyssey (III) DP XVII, LLC owns St. Charles Plaza, a 65,000 square foot retail shopping center which is anchored by a Publix Supermarket. This plaza is located on the U.S. Highway 27 corridor between Davenport and Haines City, Florida, and is across from the Heart of Florida Hospital. In addition to Publix, St. Charles Plaza is home to a Crispers restaurant, a Hair Cuttery hair salon, a Verizon Wireless store, a dentist's office, an orthodontist's office, and a rehabilitation and wellness center, among others.

Century (III) DP III, LLC and Odyssey (III) DP III, LLC. Century (III) DP III, LLC and Odyssey (III) DP III, LLC each own fifty percent (50%) of Golfview Self Storage, one of the newest self storage facilities in Lake Wales, Florida. Located on U.S. Highway 60, Golfview Self Storage offers both air-conditioned and non air-conditioned units, as well as RV and boat parking. The Project features cylinder locks for all units, an electronic gate at the access point of the center,

6

resident managers, and storage units ranging in size from 5' x 5' to 10' x 30'.

Century/AG-Avondale, LLC. Century/AG-Avondale, LLC owns Avondale Marketplace and Avondale Estates, a multi-phase, mixed-use development which will consist of four blocks of over 375,000 square feet of office and retail space, as well as 200 residential condominiums, located just outside of downtown Atlanta, Georgia. The focus of a downtown redevelopment project, Avondale Marketplace features a Publix Supermarket.

Paradise Shoppes at Apollo Beach, LLC. Paradise Shoppes at Apollo Beach, LLC owns the Shoppes of Apollo Beach, a 107,614 square foot retail center located in the fastest growing portion of Hillsborough County, Florida. This center is anchored by a Publix Supermarket and is situated at the intersection of U.S. Highway 41 and Apollo Beach Boulevard. Current tenants also include a Beef O' Brady's restuarant, the Army Corp. of Engineers, Trustco Bank, Dollar General, Bank of America, Pinch A Penny, and SouthBay Family Dentistry. This center serves the residents of waterfront developments and communities such as Andalucía, Symphony Isles, and MiraBay.

CRF-Panther IX, LLC. CRF-Panther IX, LLC owns the Century Town Center, an approximately 100,000 square foot shopping center in Vero Beach, Florida, situated adjacent to a Home Depot at the intersection of U.S. Highway 60 and 58th Ave. Century Town Center is located opposite the Indian River Mall, and sits in the main corridor accessing A1A and Interstate 95. Century Town Center represents the final large retail development site granted development approval at this strategic intersection. Current tenants include Marshalls, Home Goods, Petco, Fujiyama Steakhouse, and an Olive Garden restaurant.

GPP-Cobb, LLC.  GPP-Cobb, LLC owns the Century Shoppes of Grove Park, a 30,600 square foot neighborhood retail center with frontage on Powder Springs Road in Cobb County, Georgia.  There is currently an approximately 1.32 acre outparcel ready for development as well.

Walden Woods III, Ltd.  Walden Woods III, Ltd. owns Walden Woods South, an active retirement community located in Citrus County, Florida approximately 45 miles north of Tampa. Amenities include large full service clubhouses (with fitness room, billiards room, library, card room, and media room), heated swimming pool with jacuzzi, championship shuffleboard courts, and horseshoes.

B.    ***Reasons for Filing Chapter 11***

9.    The Debtors, for the most part, are current on monthly loan payments on the underlying mortgages secured by the Projects, utilizing rental income and loans from the CRF Group or Lawrence W. Maxwell, its chairman, to do so.  The Debtors, however, are faced with maturing loans or loans that have been declared in default, often on the basis of technical or non-monetary defaults.

10.    Traditionally, the ready liquidity of active credit markets would have allowed the Debtors either to sell the high-quality Project at issue or to obtain refinancing that would pay off the existing debt.  The global economic crisis which now envelops the country has made the refinancing or sale of commercial real estate in Florida very difficult.  Some banks themselves may be under pressure to reduce their exposure to Florida real estate and find it difficult to extend loans, much less make new loans.  Thus, as a general rule, buyers cannot obtain loans to fund the purchase, or (if they have cash or financing available) they want significant discounts from true value that would, in these cases, wipe out the significant hard-dollar investments of the Noteholders and principals.  "Take-out"

8

lenders are cautious and have underwriting standards that make new loans problematic. Generally, therefore, a frequent solution to loan difficulties in today's market is the extension of the maturity of loans at reasonable interest rates and with the elimination or relaxation of financial covenants, coupled where appropriate with subordinate financing or equity contributions to supplement cash flow of the underlying project. This is the approach that the Debtors and their affiliates have been pursuing, with generally very good results.

11.     As discussed above, the Debtors are part of a larger family of non-debtor entities. The Projects owned by the Debtors represent less than twenty percent (20%) of the overall Odyssey enterprise. Beginning approximately one and a half years ago, the Debtors and their non-debtor affiliates approached their lenders in an attempt to be proactive and to extend approaching maturities and restructure the underlying mortgage debts. In instances where loans had matured, requests were made for an extension of maturity dates. The response to date by the secured lenders has been positive, with many lenders (including SunTrust Bank, N.A., RBC Bank, and Bank Atlantic) agreeing to renewals, extensions or restructurings of the loans.

12.     Absent such agreements, Chapter 11 remains the only, or at least the best, legal vehicle to fairly restructure debts. These Chapter 11 cases seek to restructure debt owed to a handful of the Odyssey or CRF Group institutional lenders, namely, Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association ("**Wells Fargo**"), and Branch Banking & Trust Company, successor in interest to Colonial Bank by asset acquisition from the Federal Deposit Insurance Corporation as Receiver for Colonial Bank ("**BB&T**"), and Flagstar Bank, FSB ("**Flagstar**"). These loans make up less than fifteen percent (15%) of the total number of loans in connection with all of the Odyssey Projects. The Debtors will in their plan of reorganization attempt

to eliminate technical, non-monetary defaults, modify loan covenants, and extend the maturity of loans.

13.     As noted above, as of the Petition Date, Odyssey III owed approximately $29 million to the holders of the Investor Notes (the "**Noteholders**"). The net proceeds of the Investor Notes were invested in the Odyssey III Projects. The Investor Notes provide for repayment to the Noteholders of their principal indebtedness over time, along with interest accruing at a fixed rate of nine percent (9.0%) per annum. The Investor Notes were issued pursuant to an Indenture Agreement (the "**Indenture**") dated as of November 1, 2006 by and between Odyssey Properties III, LLC, CHC VII, Ltd., as guarantor, and Peter J. Munson, as indenture trustee for the Noteholders. The Investor Notes are guaranteed by Odyssey Properties III, LLC, CHC VII, Ltd. up to the lesser of $10,000,000 or the aggregate outstanding balance of the Investor Notes. As security for the Investor Notes, Odyssey III granted to the Noteholders a security interest in its interests in the special purpose entities that it owns, as well as in its accounts receivable and instruments. As part of the offering, certain affiliate entities owned by Lawrence T. Maxwell and Lawrence W. Maxwell made a sponsor loan to Odyssey III in an amount equal to five percent (5%) of the total capitalization, which is also secured under the Indenture *pro rata* with the Investor Notes. The Investor Notes are currently in default for nonpayment.

14.     The declarations of default and, in some instances, the filing of foreclosure or collection actions, by Wells Fargo and BB&T, coupled with the need to restructure the debt owed to the Noteholders, left the Debtors with no choice but to file Chapter 11 petitions in an effort to preserve the value of the Projects through a restructuring of their debts for the benefit of all creditors, including the Noteholders.

## Summary of Prepetition Secured Indebtedness

15.     <u>The Noteholders</u>.  Odyssey III's primary creditors are the Noteholders who, as discussed above, are owed approximately $29 million as of the Petition Date.

16.     <u>Mortgage Lenders</u>.  In addition to the funding from the Noteholders to Odyssey III, the special purpose entity Debtors obtained financing from Wells Fargo, BB&T and Flagstar (collectively, the "**Lenders**"), at the Project level.  Prior to the Petition Date, each of the Debtors other than Odyssey III executed promissory notes and mortgages in favor of the Lenders pursuant to which they granted liens on real estate and improvements related to certain Projects as further described in the mortgages and applicable security documents.  In addition, the Debtors executed certain assignments of leases and rents pursuant to which they assigned their rights to leases and rents in favor of certain Lenders.

17.     A summary of the Lenders and their collateral is as follows:

| Debtor | Lender | Collateral | Amount Outstanding[5] |
|---|---|---|---|
| Odyssey (III) DP XI, LLC | Branch Banking & Trust Company | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $ 5,875,219 |
| Odyssey (III) DP XVII, LLC | Wells Fargo Bank | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $10,782,171 |

---

[5]     The amounts in this column are approximate amounts and the Debtors reserve all rights with respect to the validity and amount of the Lenders' claims.

| Debtor | Lender | Collateral | Amount Outstanding[5] |
|---|---|---|---|
| Century (III) DP III, LLC; Odyssey (III) DP III, LLC | Branch Banking & Trust Company | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $ 2,239,466 |
| Paradise Shoppes at Apollo Beach, LLC | Wells Fargo Bank | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $12,828,860 |
| CRF-Panther IX, LLC | Wells Fargo Bank | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $ 18,662,481 |
| GPP-Cobb, LLC | Wells Fargo Bank | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $ 3,989,047 |
| Walden Woods III, Ltd. | Wells Fargo Bank | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $ 7,000,000 |
| Century/AG-Avondale, LLC | Flagstar Bank | Real estate, improvements, rents and leases relating to the Project, as further described in the applicable security documents | $ 7,830,093 |

## Use of Cash Collateral

18. On and following the Petition Date, the Debtors' business operations will be funded primarily from the collection of receipts generated from the Debtors' operations which may constitute cash collateral as defined in 11 U.S.C. § 363(a) ("**Cash Collateral**"). Pursuant to 11 U.S.C. §363(c)(2), on the Petition Date, the Debtors were prohibited from using Cash Collateral without the consent of the Lenders (and possibly the Noteholders) or an order of this Court. [6]

19. In order to obtain permission to use Cash Collateral, on August 3, 2010, the Debtors filed their Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Replacement Liens Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Cash Collateral Motion**") and requested emergency consideration of the Cash Collateral Motion.

20. Pursuant to the Cash Collateral Motion, the Debtors are seeking the entry of an interim order of this Court authorizing their use of Cash Collateral in accordance with a three week budget, in order to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing and the entry of a final order of the Court granting the Cash Collateral Motion. In the Cash Collateral Motion, the Debtors have agreed that, as adequate protection, each of the Lenders and, if applicable, the Noteholders will be granted a replacement lien on postpetition collateral of the same description as that subject to the Lenders' and, if applicable, Noteholders' prepetition liens, with equal extent, validity, priority, and dignity to the Lenders' and, if applicable, the Noteholders' prepetition liens.

---

[6] The Debtors do not believe that the Noteholders have an interest in Cash Collateral. To the extent that the Noteholders have an interest in Cash Collateral, the Debtors have requested that the relief requested in the Cash Collateral Motion also apply to the Noteholders.

## Proposed Use of Funds From DIP Facility

21. The Debtors have prepared a three week budget (the "**Budget**") for the period from the week ended August 8, 2010 through the week ended August 22, 2010 (the "**Budget Period**"). A copy of the Budget is attached hereto as Exhibit B and incorporated herein by this reference thereto. As indicated by the Budget, during the Budget Period, the Debtors will need funds in addition to the funds collected from their operations in order to continue in business and successfully restructure their indebtedness and reorganize their businesses for the benefit of their creditors and employees.

22. The Debtors believe that they will need to borrow funds under the DIP Facility for, among other things, the following items:

        (a)    utilities for each Project,

        (b)    common area maintenance charges for each Project,

        (c)    tenant improvements for each Project, and

        (d)    administrative costs for these Chapter 11 cases, including legal and other professional fees.

23. The proposed DIP Facility will enable the Debtors to pay ongoing operating expenses and take the required actions set forth in Paragraph 22 above which are necessary to maintain and improve the value of the collateral which has been pledged to the Lenders and, if applicable, the Noteholders. The Debtors cannot take the actions described in Paragraph 22 without the DIP Facility. If the Debtors do not take the actions described in Paragraph 22, the value of the collateral which has been pledged to the Lenders and, if applicable, the Noteholders will not be maintained and will diminish substantially.

## Terms of the DIP Facility

24.     The DIP Lender is OC DIP, LLC, a Florida limited liability company which is owned and will be funded by the following guarantors (the "**Guarantors**") of the Debtors' indebtedness to the Lenders: Lawrence W. Maxwell, Lawrence T. Maxwell, William D. Drost, T&A Family Partnership, Anchor Investment Corporation of Fla., and Century Realty Funds, Inc. Prior to the Petition Date, Lawrence W. Maxwell, Lawrence T. Maxwell, and William D. Drost were officers of the managing entities for each Debtor. Moreover, each of the Guarantors has an indirect ownership interest in certain of the Debtors. Each of the Debtors has passed resolutions approving the DIP Facility and waived all conflicts of interest of the DIP Lender.

25.     Prior to negotiating with the DIP Lender, the Debtors attempted to locate postpetition financing through normal commercial sources which typically provide such financing, but discovered that this capital market, similar to the overall debt and equity markets in the United States and worldwide, is still experiencing greatly diminished activity levels and severely limited liquidity, making the Debtors' ability to access such funding through traditional sources virtually impossible. Thus, the Debtors were forced to turn to the Guarantors, who have provided significant funding to the Debtors in the past, to obtain debtor in possession financing.

26.     The principal features of the DIP Facility, as set forth in the Term Sheet, are as follows:

(a)     Amount of Loan. The loan (the "**DIP Loan**") will be in the maximum principal amount of up to $2,900,000.00. The DIP Loan will be a revolving credit facility and will be comprised of two separate sub-facilities: Facility A and Facility B.

(b)     Facility A. The principal terms for Facility A are as follows:

(1)     Principal Amount: Up to $2,500,000.00 (the "**Facility A Loan**"), with any borrowing to be used solely for administrative costs of the Debtors and general operational costs in connection with the Projects. It is presently anticipated that approximately $50,000 of the Facility

A Loan will be advanced prior to the final hearing on this Motion.

(2) Advances Under Facility A: Advances under Facility A (the "**Facility A Advances**") shall be made at any Debtor's request and funded solely in the DIP Lender's discretion. Any Debtor shall provide the DIP Lender with a written request for any Facility A Advance (a "**Facility A Request for Advance**") no later than five (5) business days prior to the date of the requested funding of the Facility A Advance. The DIP Lender shall provide the requesting Debtor(s), within three (3) business days of said Facility A Request for Advance, notice of the DIP Lender's approval of said Facility A Request for Advance. If no notice is given by the DIP Lender to the requesting Debtor(s) following the Facility A Request for Advance, the Facility A Advance shall not be made by the DIP Lender. If notice is given by the DIP Lender to the requesting Debtor(s) indicating the DIP Lender's approval of the Facility A Request for Advance, the DIP Lender shall make the Facility A Advance in good funds to the requesting Debtor(s) on the date requested by the Debtor(s).

(3) Security and Priority: Facility A will be an unsecured loan to the applicable Debtors. The DIP Lender will be granted a superpriority administrative expense claim under Section 364(c) of the Bankruptcy Code for all amounts advanced under Facility A.

(4) Interest. The Facility A Loans will bear interest at zero percent (0%) per annum.

(5) Maturity Date. All Facility A Loans shall become due and payable upon the earlier to occur of: (i) one year from the entry by the Court of the Interim Borrowing Order; (ii) the entry of an order providing for the appointment of a trustee in these Chapter 11 cases; (iii) the entry of an order providing for the dismissal of these Chapter 11 cases; (iv) the entry of an order providing for the conversion of these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code; (v) confirmation of a plan of reorganization in these cases; (vi) the filing of any suit by the Lenders in any jurisdiction against any Guarantor in connection with any of the Debtors' pre-petition loans or obligations to the Lenders; or (vii) the continuance of prosecution of any of the Existing Suits (as defined below) by any of the Lenders.

(c) Facility B. The principal terms for Facility B are as follows:

(1) Principal Amount: Up to $400,000.00 (the "**Facility B Loan**"), with any borrowing to be used solely for the cost of any tenant improvements constructed at any of the Projects (collectively, the "**Tenant Improvements**"). It is presently anticipated that there will be no advances under the Facility B Loan prior to the final hearing on the Motion.

(2)     Advances Under Facility B: Advances under Facility B (the "**Facility B Advances**") shall be made at any Debtor's request and funded solely in the DIP Lender's discretion. Facility B Advances shall only be made by the DIP Lender to any Debtor for the funding of any Tenant Improvements in connection with either: (i) leases commencing or renewing at any of the Projects subsequent to the Petition Date, or (ii) existing leases where any Debtor has agreed to fund Tenant Improvements but where such Tenant Improvements have not been completed ((i) and (ii), collectively, the "**Funded Leases**"). Any Debtor shall provide the DIP Lender with a written request for any Facility B Advance (a "**Facility B Request for Advance**"), along with a copy of the proposed lease terms in form satisfactory to the DIP Lender, no later than five (5) business days prior to the date of the requested funding of the Facility B Advance. The DIP Lender shall provide the requesting Debtor(s), within three (3) business days of said Facility B Request for Advance, notice of the DIP Lender's approval of said Facility B Request for Advance. If no notice is given by the DIP Lender to the requesting Debtor(s) following the Facility B Request for Advance, the Facility B Advance shall not be made by the DIP Lender. If notice is given by the DIP Lender to the requesting Debtor(s) indicating the DIP Lender's approval of the Facility B Request for Advance, the DIP Lender shall make the Facility B Advance in good funds to the requesting Debtor(s) on the date requested by the Debtor(s).

(3)     Security and Priority: Facility B will be secured by all of the Tenant Improvements and the lien granted to the DIP Lender will be senior to all prepetition and postpetition liens of the Lenders and all other parties in the assets and property of the Debtors. Upon the making of any Facility B Advance, the DIP Lender shall, at the Debtors' expense, record and file any documents necessary to perfect its security interest(s) in the applicable Project's Tenant Improvements. The DIP Lender will also be granted a superpriority administrative expense claim under Section 364(c) of the Bankruptcy Code for all amounts advanced under Facility B.

(4)     Interest. The Facility B Loans will bear interest at zero percent (0%) per annum.

(5)     Repayment. With respect to the Funded Leases, during the term of Facility B, fifty percent (50%) of all gross rents collected by all applicable Debtors in connection with the Funded Leases will be paid upon receipt by the applicable Debtors directly to the DIP Lender as partial repayment under Facility B. The balance of the Facility B Loans shall be due and payable upon the Facility B Maturity Date (as defined below).

(6) Maturity Date. All Facility B Loans shall become due and payable upon the earlier to occur of: (i) one year from the entry by the Court of the Interim Borrowing Order; (ii) the entry of an order providing for the appointment of a trustee in these Chapter 11 cases; (iii) the entry of an order providing for the dismissal of these Chapter 11 cases; (iv) the entry of an order providing for the conversion of these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code; (v) confirmation of a plan of reorganization in these cases; (vi) the filing of any suit by the Lenders in any jurisdiction against any Guarantor in connection with any of the Debtors' pre-petition loans or obligations to the Lenders; or (vii) the continuance of prosecution of any of the Existing Suits by any of the Lenders (the "**Facility B Maturity Date**").

(d) Conditions Precedent to Lending. Each of the following are conditions precedent to any Facility A Advances and Facility B Advances: (i) prior to Closing and continuing during the terms of the Facility A Loan and the Facility B Loan, the DIP Lender shall be designated as the manager for each limited liability company Debtor; (ii) OC DIP SUB 1, LLC, a Florida limited liability company, shall be designated as the general partner of Walden Woods III, Ltd.; (iii) other than the existing lawsuits which have been initiated by certain of the Lenders prior to the Petition Date (the "**Existing Suits**"), there shall not be pending, at any time during the terms of the Facility A Loan and the Facility B Loan, any additional suits in any jurisdiction against any Guarantors in connection with any of the Debtors' pre-petition loans or obligations to the Lenders; and (iv) the Facility B Advances shall only be used by any applicable Debtor for the funding of construction of Tenant Improvements in connection with Funded Leases.

(e) Closing. The closing (the "**Closing**") of the DIP Facility shall occur promptly upon, but no later than fourteen (14) days after, the entry of the initial order of the Court granting this Motion (the "**Interim Borrowing Order**"). At the Closing, the Debtors will execute and deliver the DIP Loan Documents to the DIP Lender. It is presently anticipated that the DIP Loan Documents will consist of a promissory note, a security agreement, and UCC-1 financing statements for the appropriate jurisdictions.

(e) Costs and Expenses. The Debtors shall pay any costs associated with the DIP Loan, including filing and recording of any documents necessary to perfect the security interest of the DIP Lender pursuant to Facility B Advances.

(g) Prepayment. The DIP Loan may be prepaid at any time, in part or in fully, by any Debtor with no penalty.

18

(h)     Indemnification. The Debtors shall indemnify and hold harmless the DIP Lender and each of its affiliates and officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and reasonable expenses (including without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the Facility A Loan or the Facility B Loan, the DIP Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the Facility A Loan or the Facility B Loan, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence, willful misconduct or breach of contract. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Debtor, any of its directors, security holders or creditors, any Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Debtors further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

27.     The description of the Term Sheet contained above in this Motion is intended as a summary only and is qualified in its entirety by reference to the Term Sheet itself, and to the extent there is any inconsistency between the language of the Term Sheet and the description thereof set forth in this Motion, the Term Sheet shall control any such inconsistency. Each creditor of the Debtors and party in interest should read, consider and carefully analyze the terms and provisions of the Term Sheet.

## Relief Requested and Ground for Relief

28.     The Debtors hereby request authority, pursuant to Sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014, to obtain postpetition loans, advances and other financial accommodations from the DIP Lender in an amount of up to $2,900,000.00, including $50,000.00 on an interim basis.  As stated above, Facility B Advances will be secured in part by a security interest in and lien on all Tenant Improvements of the Debtors as described above which will be senior to any existing prepetition and postpetition liens, including any and all liens held by the Lenders. The DIP Lender shall not be granted a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, or 553(b) of the Bankruptcy Code.

29.     The liens to be granted in favor of the DIP Lender shall prime the liens granted in favor of the Lenders to the extent they have a lien on the Tenant Improvements.  Except for the priming of any liens held by the Lenders in the Tenant Improvements, the Lenders shall retain all rights, defenses and claims under their respective loan and security documents and the Debtors shall reserve, and are not waiving, any of their rights with respect to the claims and liens of the Lenders.

30.     The Debtors further request authority to enter into the DIP Loan Documents with the DIP Lender.

31.     As additional assurance that the DIP Facility will be repaid, the DIP Lender will be granted and allowed a superpriority administrative expense claim in accordance with Section 364(c)(1) of the Bankruptcy Code having priority and right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims against the Debtors now existing or hereafter arising, of any kind or nature  whatsoever, including, without limitation, all

administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, provided, however, such claim will not have priority over U.S. Trustee fees and fees of professionals engaged by the Debtors with the approval of the Court in an amount to be determined at the final hearing on the Motion (the "**Carve-Out**").

32.     The Debtors believe that the financing described herein is in their best interests and the best interest of their creditors. The financing provided herein will allow the Debtors to maximize their ability to continue their businesses without interruption.

33.     The Debtors are presently unable to obtain, in the ordinary course of business or otherwise:

(a)     pursuant to Section 364(a) or 364(b) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense;

(b)     pursuant to Section 364(c)(1) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code;

(c)     pursuant to Section 364(c)(2) of the Bankruptcy Code, credit secured by a lien on property of the estate that is not otherwise subject to a lien;

(d)     pursuant to Section 364(c)(3) of the Bankruptcy Code, credit secured by a junior lien on property of the estate that is subject to a lien; or

(e)     credit on any basis other than that described in the Term Sheet.

34.     After considering all of the alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided under the terms of the Term Sheet and

this Motion represents the best financing available to the Debtors and is in the best interests of the Debtors, their creditors and other parties in interest.

35. There can be no assurance that the Lenders will consent prior to the initial hearing on this Motion to the granting of a senior lien in favor of the DIP Lender as contemplated by the DIP Facility and the DIP Loan Documents. In the absence of such consent, the Debtors allege that the Lenders will be adequately protected within the meaning of 11 U.S.C. §§ 361 and 363, by virtue of numerous factors, including:

(a) the Debtors' assets will continue to serve as collateral for the liens of the Lenders;

(b) a significant portion of the amounts advanced by the DIP Lender will be used to fund the costs of Tenant Improvements, which will increase the value of the collateral held by the Lenders and result in an "equity cushion";

(c) the amounts advanced under the DIP Facility will be in accordance with a budget approved by the DIP Lender and subject to approval of this Court; and

(d) the value of the Debtors' assets in their current state will increase in value by an amount equal to or greater than the proceeds from the DIP Facility.

36. In conclusion, if the Debtors fail to receive the needed financing and are thus required to discontinue or curtail their business activities and operations, there will likely be insufficient assets available to make full payment to any class of creditor.

37. Good cause has been shown for the entry of an order granting this Motion pursuant to Bankruptcy Rule 4001(c)(2). In particular, entry of the order is in the best interest of the Debtors and their businesses and their ability to continue to operate as a going concern.

38. As set forth in the Motion, the DIP Lender and the Debtors have negotiated the terms and conditions of the DIP Facility in good faith and at arm's-length, and the terms and conditions of the DIP Loan Documents are fair and reasonable and are supported by reasonably equivalent value.

The Debtors request that this Court find that any credit extended by the DIP Lender pursuant to the terms of the DIP Loan Documents will have been extended in "good faith" (as that term is used in Section 364(e) of the Bankruptcy Code).

**Notice**

39.    A copy of this Motion is being sent by (i) the Court's CM/ECF system to the Office of the United States Trustee, and (ii) United States first class mail to all known secured creditors of the Debtors, including each of the Lenders and all of the Noteholders, the DIP Lender, all parties listed on the Local Rule 1007(d) Parties in Interest List for these cases, and certain other parties listed in the Certificate of Service. Accordingly, the Debtors request that the Court enter an order finding that such notice of this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court. The Debtors submit that, given the emergency nature of the relief requested herein, no other or further notice need be given.

**Basis for Emergency Relief**

40.    The facts previously set out herein clearly justify an immediate hearing on this Motion. The Debtors require the DIP Facility described herein in order to fund their business operations and the other costs described hereinabove. The Debtors will provide the form of the proposed Interim Borrowing Order to counsel to the Lenders and to any parties requesting same prior to the hearing on this Motion.

WHEREFORE, the Debtors respectfully request that this Court enter an order granting this Motion, authorizing the Debtors to obtain financing and grant liens pursuant to 11 U.S.C. §§ 364(c) and (d) in accordance with the terms and conditions of the DIP Loan Documents, authorizing the Debtors' borrowing of $50,000.00 pursuant to the terms of the Interim Borrowing Order and pending a final hearing pursuant to Bankruptcy Rule 4001, and granting such other and further relief as may be just and proper.

Dated this 3rd day of August, 2010.

 */s/ Edward J. Peterson, III*
Harley E. Riedel
Florida Bar No. 183628
Edward J. Peterson, III
Florida Bar No. 0014612
B. Michael Bachman, Jr.
Florida Bar No. 0014139
Stichter Riedel Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
(813) 229-0144 – Phone
(813) 229-1811 – Fax
hriedel@srbp.com
epeterson@srbp.com
mbachman@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **Debtors' Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001** together with attached Exhibits A and B has been furnished on this 3rd day of August, 2010 has been furnished by the Court's CM/ECF Noticing System, by E-Mail, or by U.S. Mail to:

**By CM/ECF:**

Office of the United States Trustee
501 E. Polk Street
Suite 1200
Tampa, FL 33604

**By E-Mail:**

Flagstar Bank
Gary W. Farris, Esq.
Burr & Forman LLP
171 Seventeenth St., NW
Suite 1100
Atlanta, GA 30363
gfarris@burr.com

Wells Fargo Bank, N.A.
c/o John Muratides, Esq.
P.O. Box 3299
Tampa, FL 33601
jmuratides@stearnsweaver.com

Wells Fargo Bank, N.A.
c/o Brooks C. Morel, Esq.
201 17th St. NW, #1700
Atlanta, GA 30363
brooks.morel@nelsonmullins.com

Branch Banking & Trust Co.
c/o Gary W. Johnson, Esq.
P.O. Box 1171
Orlando, FL 32802
gjohnson@carltonfields.com

Branch Banking & Trust Co.
c/o R. Russell Berry, Esq.
271 17th St. NW, #2400
Atlanta, GA 30363
rberry@wcsr.com

Alif 1 Trucking
David Crosby, Esq
1800 Century Blvd NE
Atlanta, GA 30345
Dcrosby@crosby-associates.net

Cleveland Construction
Michael P. Davis
191 Peachtree St.
Atlanta, GA 30303
michael.davis@chamberlainlaw.com

Cowin Equipment
Sheetal Desai, Esq
3140 Overland Drive
Roswell, GA 30075
sdesai@bglawgroup.net

Ferguson Enterprises
Andrew Becker
5755 N. Point Pkwy. #284
Alpharetta, GA 30022
abecker@merbaumlawgroup.com

Greg Holland, Inc.
100 Howell Ave
Fairburn, GA 30213
gregh@greghollandinc.com

Rhino Rolloffs
Eddie Hartness
620 Spring Street SE
Gainesville, GA 30501
elhartness@bellsouth.net

Simco Interiors
Kin Picker, Esq.
P.O. Box 923624
Norcross, GA 30010
kin@rkpjrlaw.com

Zala L. Forizs, Esq.
Forizs & Dogali PL
4301 Anchor Plaza Pkwy
Suite 300
Tampa, FL 33634-7521
zforizs@forizs-dogali.com

Peter Munson, Esq.
  as Indenture Trustee for Noteholders
Wanda H. Golson, Esq.
Golson Legal, P.A.
1724 E. 5th Ave.
Tampa, FL 33605
wandagolson@golsonlegal.com

Peter J. Munson, Esq.
  As Indenture Trustee for Noteholders
1611 Harden Blvd.
Lakeland, FL 33803-1826
pmunson7@aol.com

**By U.S. Mail:**

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA 19114-0326

All remaining creditors

_/s/ Edward J. Peterson, III_
Edward J. Peterson, III

27

# EXHIBIT "A"

August 3, 2010

<u>**$2,900,000 DEBTOR-IN-POSSESSION DUAL CREDIT FACILITY**</u>

*SUMMARY OF TERMS AND CONDITIONS*

| | |
|---|---|
| **Borrowers:** | Odyssey Properties III, LLC, a Florida limited liability company; |

**Borrowers:** Odyssey Properties III, LLC, a Florida limited liability company;
Odyssey (III) DP XI, LLC, a Florida limited liability company;
Odyssey (III) DP XVII, LLC, a Florida limited liability company;
Century (III) DP III, LLC, a Florida limited liability company;
Odyssey (III) DP III, LLC, a Florida limited liability company;
Century/AG-Avondale, LLC, a Florida limited liability company;
Paradise Shoppes at Apollo Beach, LLC, a Florida limited liability
company;
CRF-Panther IX, LLC, a Florida limited liability company;
GPP-Cobb, LLC, a Florida limited liability company; and
Walden Woods III, Ltd., a Florida limited partnership (each a "**Borrower**"
or "**Debtor**," and collectively, the "**Borrowers**" or "**Debtors**"), as
Debtors-in-Possession in case # 8:10-BK-18713-CPM (the
"**Chapter 11 Proceeding**") pending under Chapter 11 in the
United States Bankruptcy Court for the Middle District of Florida
(the "**Court**")

**Lender:** OC DIP, LLC, a Florida limited liability company (the "**Lender**")

| | |
|---|---|
| Manager: | Lawrence W. Maxwell |
| Members: | Lawrence W. Maxwell (16.666%); |
| | Lawrence T. Maxwell (16.666%); |
| | William D. Drost (16.666%); |
| | T&A Family Partnership (16.666%); |
| | Anchor Investment Corporation of Fla. (16.666%); and |
| | Century Realty Funds, Inc. (16.666%) (collectively, the "**Guarantors**") |

**Pre-petition
Senior
Lenders:** Wells Fargo Bank, National Association, successor by merger to
Wachovia Bank, National Association ("**Wells Fargo**");
Branch Banking & Trust Company, successor in interest to Colonial Bank
by asset acquisition from the Federal Deposit Insurance
Corporation as Receiver for Colonial Bank ("**BB&T**"); and
Flagstar Bank, FSB, a federal savings bank ("**Flagstar**", and collectively
with Wells Fargo and BB&T, the "**Pre-Petition Lenders**")

**Total Loan
Amount:** Up to $2,900,000. The loan shall be a revolving credit facility and will be comprised of two separate sub-facilities: Facility A and Facility B.

**Facility A:** (a) **Principal Amount**: Up to $2,500,000. Any borrowing under Facility A shall be used solely for administrative costs of the Debtors and general operational costs in connection with the Projects. It is presently anticipated that approximately $50,000 of the Facility A Loan will be advanced prior to the final hearing on the Borrowers' Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§364(c) and (d) and F.R.B.P. 4001 (the "**Motion**").

(b) **Priority and Security**: Facility A will be an unsecured loan to the applicable Debtors. The Lender will be granted a superpriority administrative expense claim under Section 364(c) of the Bankruptcy Code for all amounts funded under Facility A (the "**Facility A Loans**").

(c) **Advances Under Facility A**: Advances under Facility A ("**Facility A Advances**") shall be made at any Borrower's request and funded solely in Lender's discretion. The Facility A Advances will be used for administrative costs of the Borrowers and general operational costs in connection with the Projects. Any Borrower shall provide Lender with a written request for any Facility A Advance (a "**Facility A Request for Advance**") no later than five (5) business days prior to the date of the requested funding of the Facility A Advance. Lender shall provide the requesting Borrower(s), within three (3) business days of said Facility A Request for Advance, notice of Lender's approval of said Facility A Request for Advance. If no notice is given by Lender to Borrower(s) following the Facility A Request for Advance, the Facility A Advance shall not be made by Lender. If notice is given by Lender to Borrower(s) indicating Lender's approval of the Facility A Request for Advance, the Lender shall make the Facility A Advance in good funds to the Borrower(s) on the date requested by the Borrower(s).

(d) **Term and Repayment**: All Facility A Loans shall become due and payable upon the earlier to occur of: (i) one year from the entry by the Court of the Interim Borrowing Order (as defined below) approving this transaction; (ii) the appointment of a Trustee in the Chapter 11 Proceeding; (iii) dismissal of the Chapter 11 Proceeding; (iv) conversion of the Chapter 11 Proceeding to a Chapter 7 Proceeding; (v) confirmation of the Debtors' Joint Plan of Reorganization; (vi) the filing of any suit by the Pre-Petition Lenders in any jurisdiction against any Guarantor in connection

2

with any of the Borrower's pre-petition loans or obligations to the Pre-Petition Lenders; or (vii) the continuance of prosecution of any of the Existing Suits, as defined below, by any of the Pre-Petition Lenders.

(e) **Interest**: The Facility A Loans will bear interest at zero percent (0%) per annum.

**Facility B:** (a) **Principal Amount**: Up to $400,000. Any borrowing under Facility B shall be used solely for the cost of any new tenant improvements constructed at the Projects (collectively, the **"Tenant Improvements"**), as detailed below. It is presently anticipated that there will be no advances under the Facility B Loan prior to the final hearing on the Motion.

(b) **Priority and Security**: The Facility B loans (the **"Facility B Loans"**) shall be secured super-priority loans to the applicable Debtors, secured by all of the TI constructed in connection with the TI Funded Leases and such lien will be senior to all prepetition and postpetition liens of the Pre-Petition Lenders and all other parties in the assets and property of the Borrowers. Lender will also be granted a superpriority administrative expense claim under Section 364(c) of the Bankruptcy Code for all amounts advanced under Facility B.

(c) **Advances Under Facility B**: Advances under Facility B (**"Facility B Advances"**) shall be made at any Borrower's request and funded solely in Lender's discretion. Facility B Advances shall only be made by Lender to any Borrower for the funding of any Tenant Improvement construction in connection with either: (i) leases commencing or renewing at any of the Projects subsequent to the Petition Date, or (ii) existing leases where any Borrower has agreed to fund the construction of Tenant Improvements but where said Tenant Improvements have not been completed ((i) and (ii), collectively, the **"Funded Leases"**). Any Borrower shall provide Lender with a written request for any Facility B Advance (a **"Facility B Request for Advance"**), along with a copy of the proposed lease terms in form satisfactory to Lender, no later than five (5) business days prior to the date of the requested funding of the Facility B Advance. Lender shall provide the requesting Borrower(s), within three (3) business days of said Facility B Request for Advance, notice of Lender's approval of said Facility B Request for Advance. If no notice is given by Lender to Borrower(s) following the Facility B Request for Advance, the Facility B Advance shall not be made by Lender. If notice is given by Lender to Borrower(s) indicating Lender's approval of the Facility B Request for Advance, the Lender shall make the Facility B Advance in good funds to the Borrower(s) on the date requested by the Borrower(s).

3

(d) **Repayment**: With respect to the Funded Leases, during the Term of Facility B, as defined below, fifty percent (50%) of all gross rents collected by all applicable Borrowers in connection with Funded Leases will be paid upon receipt by the applicable Borrowers directly to the Lender as partial repayment under Facility B. The balance of the Facility B Loans shall be due and payable upon the Facility B Maturity Date, as defined below.

(e) **Term**: All Facility B Loans shall become due and payable upon the earlier to occur of: (i) one year from the entry by the Court of the Interim Borrowing Order (as defined below) approving this transaction; (ii) the appointment of a Trustee in the Chapter 11 Proceeding; (iii) dismissal of the Chapter 11 Proceeding; (iv) conversion of the Chapter 11 Proceeding to a Chapter 7 Proceeding; (v) confirmation of the Debtors' Joint Plan of Reorganization; (vi) the filing of any suit by the Pre-Petition Lenders in any jurisdiction against any Guarantor in connection with any of the Borrower's pre-petition loans or obligations to the Pre-Petition Lenders; or (vii) the continuance of prosecution of any of the Existing Suits, as defined below, by any of the Pre-Petition Lenders (each, a "**Facility B Maturity Date**").

(f) **Interest**: The Facility B Loans will bear interest at zero percent (0%) per annum.

**Conditions of Lending**: Prior to Closing and continuing during the Terms of the Facility A Loan and the Facility B Loan (collectively, the "**Loans**"), (i) Lender shall be designated as the manager for each limited liability company Borrower, and (ii) OC DIP SUB 1, LLC, a Florida limited liability company, shall be designated as the general partner of Walden Woods III, Ltd.

Other than the existing suits which have been initiated by certain Pre-Petition Lenders prior to the Petition Date (the "**Existing Suits**"), there shall not be pending, at any time during the Terms of the Loans, any additional suits in any jurisdiction against any Guarantors in connection with any of the Borrower's pre-petition loans or obligations to the Pre-Petition Lenders.

The Facility B Advances shall only be used by any applicable Borrower for the funding of construction of Tenant Improvements in connection with Funded Leases.

Upon the occurrence of a Facility B Advance, Lender shall, at Borrower's expense, record and file any documents necessary to perfect its security interest(s) in the applicable Project's Tenant Improvements.

**Closing:** The closing (the **"Closing"**) shall occur promptly upon, but no later than fourteen (14) days after, the entry of the initial order of the Court granting the Motion (the **"Interim Borrowing Order"**). At the Closing, the Borrowers will execute and deliver the DIP Loan Documents to the Lender. It is presently anticipated that the DIP Loan Documents will consist of a promissory note, a security agreement, and UCC-1 financing statements for the appropriate jurisdictions.

**Costs and Expenses:** Borrowers shall pay any costs associated with the Loans, including filing and recording of any documents necessary to perfect the security interest of the Lender pursuant to Facility B Advances.

**Prepayment:** The Loans may be prepaid at any time, in part or in full, by any Borrower with no penalty.

**Conditions Precedent to Closing:** All necessary documentation relating to the Loans shall be in form and substance reasonably satisfactory to the Borrowers and their counsel and Lender and its counsel.

The Court shall enter an Order establishing the following:

- The Lender will be granted a superpriority administrative expense claim under Section 364(c) for all amounts funded under Facility A; and
- Facility B is a loan secured by any tenant improvements constructed at any of the Borrower's Projects utilizing any of the Facility B Advances that is senior to all prior and existing liens of the Borrowers.

All necessary parties to all Borrowers, as well as the Lender, pursuant to their respective operating or partnership agreements, have approved Facility A and Facility B and waived all conflicts.

**Indemnification:** The Borrowers shall indemnify and hold harmless Lender and each of its affiliates and each of the respective officers, directors, employees, agents, advisors, attorneys and representatives involved with the Loans (each, an **"Indemnified Party"**) from and against any and all claims, damages, losses, liabilities and reasonable expenses (including without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of

5

any defense in connection therewith), in each case arising out of or in connection with or by reason of Facility A or Facility B, the loan documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of Facility A or Facility B, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence, willful misconduct or breach of contract. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Borrower, any of its directors, security holders or creditors, any Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The Borrowers further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrowers or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

**Confidentiality**: This Term Sheet shall be held in confidence by the Borrowers and may not be disclosed to any person or entity, other than to the Borrowers' officers, directors, agents and professional advisors, without the Lender's express written consent. The Borrowers may file this Term Sheet with the Court or attach this Term Sheet as an Exhibit to the Motion.

**Expiration of Offer:** This offer for financing by Lender shall expire August 10, 2010, if the terms set forth herein are not met by the Borrowers, without further notice or act.

[SIGNATURES ARE ON THE FOLLOWING PAGE]

Executed this 3rd day of August, 2010.

Borrowers:

PARADISE SHOPPES AT
APOLLO BEACH, LLC
ODYSSEY (III) DP XI, LLC
CENTURY (III) DP III, LLC
ODYSSEY (III) DP III, LLC
ODYSSEY (III) DP XVII, LLC
CRF-PANTHER IX, LLC
CENTURY/AG – AVONDALE, LLC
GPP – COBB, LLC
ODYSSEY PROPERTIES III, LLC
WALDEN WOODS III, LTD.

By: _____
William Maloney
Chief Restructuring Officer

Executed this 3rd day of August, 2010.

Lender:

OC DIP, LLC

By: _____

Ben Falk
Chief Financial Officer

EXHIBIT "B"

## TOTAL CASH NEEDED
## WEEKLY CASH PROJECTION

| | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | 156,945 | $ | 6,551 | $ | 3,766 | $ | 167,262 |
| PROPERTY INSURANCE INCOME | | 1,236 | | 234 | | 30 | | 1,500 |
| PROPERTY TAX INCOME | | 2,689 | | 464 | | 63 | | 3,216 |
| COMMON AREA MAINTENANCE | | 14,716 | | 544 | | 86 | | 15,346 |
| SALES TAX | | 11,667 | | 405 | | 271 | | 12,343 |
| MISCELLANEOUS INCOME | | 111 | | 51 | | 49 | | 210 |
| MERCHANDISE SALES | | 66 | | 63 | | 61 | | 191 |
| LATE CHARGES | | 60 | | 57 | | 55 | | 172 |
| GUEST FEES | | 10 | | – | | – | | 10 |
| MOBILE HOME DEPOSITS NON-REFUNDABLE | | – | | – | | 11,000 | | 11,000 |
| MOBILE HOME SALES | | – | | – | | – | | – |
| PREPETITION AR COLLECTIONS | | 6,093 | | 15,910 | | – | | 22,002 |
| DIP FINANCING | | 15,132 | | 23,334 | | 11,184 | | 49,650 |
| **TOTAL RECEIPTS** | **$** | **208,724** | **$** | **47,613** | **$** | **26,566** | **$** | **282,903** |
| | | | | | | | | |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| UTILITIES | $ | 1,169 | $ | 15,861 | $ | 6,210 | $ | 23,240 |
| COMMON AREA MAINTENANCE | | 29,593 | | 10,053 | | 6,640 | | 46,286 |
| LEGAL & PROFESSIONAL | | 10,000 | | 10,000 | | 7,499 | | 27,500 |
| SALES TAX | | – | | – | | 20,778 | | 20,778 |
| UTILITY DEPOSITS | | – | | – | | 11,621 | | 11,621 |
| LEASE COMMISSION | | – | | 15,120 | | – | | 15,120 |
| PAYROLL | | – | | – | | – | | – |
| MANAGEMENT FEE | | 151 | | – | | – | | 151 |
| REPAIRS & MAINTENANCE | | 1,492 | | 1,575 | | 1,975 | | 5,042 |
| OPERATIONAL OTHER | | 8 | | 657 | | 2,619 | | 3,284 |
| INSURANCE | | – | | 716 | | 752 | | 1,468 |
| COST OF SALES | | 15,000 | | 15,000 | | – | | 30,000 |
| SALES & MARKETING | | 1,600 | | 2,950 | | 1,600 | | 6,150 |
| **TOTAL EXPENDITURES FROM OPERATIONS** | **$** | **59,013** | **$** | **71,933** | **$** | **59,694** | **$** | **190,639** |
| **NET CASH FROM OPERATIONS** | **$** | **149,711** | **$** | **(24,319)** | **$** | **(33,128)** | **$** | **92,264** |
| TENANT IMPROVEMENT MONEY | | – | | – | | – | | – |
| **NET CASH** | **$** | **149,711** | **$** | **(24,319)** | **$** | **(33,128)** | **$** | **92,264** |

|  | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | 36,993 | $ | 397 | $ | 834 | $ | 38,224 |
| PROPERTY INSURANCE INCOME | | 680 | | 82 | | 30 | | 792 |
| PROPERTY TAX INCOME | | 1,071 | | 140 | | 63 | | 1,275 |
| COMMON AREA MAINTENANCE | | 4,287 | | 177 | | 86 | | 4,551 |
| SALES TAX | | 3,016 | | 56 | | 71 | | 3,143 |
| MISCELLANEOUS INCOME | | 58 | | − | | − | | 58 |
| PREPETITION AR COLLECTIONS | | 5,027 | | 8,020 | | − | | 13,047 |
| DIP FINANCING | | | | | | | | − |
| **TOTAL RECEIPTS** | $ | 51,134 | $ | 8,873 | $ | 1,083 | $ | 61,090 |
| | | | | | | | | |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| UTILITIES | $ | − | $ | 6,150 | $ | − | $ | 6,150 |
| UTILITY DEPOSITS | | | | | | 3,075 | | 3,075 |
| COMMON AREA MAINTENANCE | | 6,902 | | 6,122 | | 1,208 | | 14,232 |
| LEGAL & PROFESSIONAL | | 1,111 | | 1,111 | | 833 | | 3,056 |
| SALES TAX | | | | | | 5,047 | | 5,047 |
| LEASE COMMISSION | | | | 15,120 | | | | 15,120 |
| **TOTAL EXPENDITURES FROM OPERATIONS** | $ | 8,014 | $ | 28,503 | $ | 10,163 | $ | 46,680 |
| **NET CASH FROM OPERATIONS** | $ | 43,120 | $ | (19,631) | $ | (9,080) | $ | 14,410 |

## ODYSSEY (III) DP XI. LLC - ALEXANDER CROSSINGS
### WEEKLY CASH PROJECTION

|  | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | 17,179 | $ | 875 | $ | − | $ | 18,054 |
| PROPERTY INSURANCE INCOME | | 354 | | 43 | | − | | 397 |
| PROPERTY TAX INCOME | | 843 | | 113 | | − | | 956 |
| CAM | | 1,293 | | 156 | | − | | 1,450 |
| SALES TAX | | 1,377 | | 83 | | − | | 1,460 |
| PREPETITION AR COLLECTIONS | | − | | − | | − | | − |
| **TOTAL RECEIPTS** | **$** | **21,047** | **$** | **1,270** | **$** | **−** | **$ 22,317** | |
| | | | | | | | | |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| UTILITIES | $ | − | $ | − | $ | 3,963 | $ | 3,963 |
| UTILITY DEPOSITS | | | | | | 1,982 | | 1,982 |
| CAM | | 1,618 | | 1,642 | | 2,721 | | 5,981 |
| LEGAL & PROFESSIONAL | | 1,111 | | 1,111 | | 833 | | 3,056 |
| SALES TAX | | | | | | 2,263 | | 2,263 |
| LEASE COMMISSION | | | | | | | | − |
| **TOTAL EXPENDITURES FROM OPERATIONS** | **$** | **2,729** | **$** | **2,754** | **$** | **11,762** | **$ 17,244** | |
| **NET CASH FROM OPERATIONS** | **$** | **18,318** | **$** | **(1,483)** | **$** | **(11,762)** | **$** | **5,073** |

## GOLFVIEW SELF STORAGE
## WEEKLY CASH PROJECTION

|  | Week Ended 8/8/2010 | Week Ended 8/15/2010 | Week Ended 8/22/2010 | TOTAL |
|---|---|---|---|---|
| **CASH RECEIPTS** | | | | |
| RENTAL INCOME | $ 3,021 | $ 2,822 | $ 2,797 | $ 8,641 |
| MERCHANDISE SALES | 66 | 63 | 61 | 191 |
| LATE CHARGES | 60 | 57 | 55 | 172 |
| SALES TAX | 216 | 202 | 200 | 618 |
| MISCELLANEOUS INCOME | 53 | 51 | 49 | 153 |
| DIP FINANCING | | 499 | | 499 |
| **TOTAL RECEIPTS** | $ 3,417 | $ 3,695 | $ 3,163 | $ 10,274 |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | |
| UTILITIES | $ - | $ 1,800 | $ - | $ 1,800 |
| PAYROLL | - | - | - | - |
| MANAGEMENT FEE | 151 | | | 151 |
| LEGAL & PROFESSIONAL | 1,111 | 1,111 | 833 | 3,056 |
| REPAIRS & MAINTENANCE | - | 1,575 | - | 1,575 |
| OPERATIONAL OTHER | - | 647 | 442 | 1,089 |
| INSURANCE | | 716 | | 716 |
| UTILITY DEPOSITS | | | 900 | 900 |
| SALES TAX | | | 850 | 850 |
| **TOTAL EXPENDITURES FROM OPERATIONS** | $ 1,262 | $ 5,849 | $ 3,025 | $ 10,137 |
| **NET CASH FROM OPERATIONS** | $ 2,154 | $ (2,155) | $ 137 | $ 137 |

## ODYSSEY (III) DP XVII, LLC - HOLLY HILLS
### WEEKLY CASH PROJECTION

|  | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | 44,692 | $ | − | $ | − | $ | 44,692 |
| PROPERTY INSURANCE INCOME | | 158 | | − | | − | | 158 |
| PROPERTY TAX INCOME | | 663 | | − | | − | | 663 |
| CAM | | 2,261 | | − | | − | | 2,261 |
| SALES TAX | | 3,344 | | − | | − | | 3,344 |
| PREPETITION AR COLLECTIONS | | − | | − | | − | | − |
| **TOTAL RECEIPTS** | **$** | **51,119** | **$** | **−** | **$** | **−** | **$** | **51,119** |
| | | | | | | | | |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| UTILITIES | $ | 21 | $ | 1,887 | $ | − | $ | 1,908 |
| UTILITY DEPOSITS | | | | | | 954 | | 954 |
| CAM | | 6,632 | | 1,589 | | − | | 8,221 |
| LEGAL & PROFESSIONAL | | 1,111 | | 1,111 | | 833 | | 3,056 |
| SALES TAX | | | | | | | | − |
| LEASE COMMISSION | | | | | | | | − |
| **TOTAL EXPENDITURES FROM OPERATIONS** | **$** | **7,764** | **$** | **4,587** | **$** | **1,787** | **$** | **14,138** |
| | | | | | | | | |
| **NET CASH FROM OPERATIONS** | **$** | **43,355** | **$** | **(4,587)** | **$** | **(1,787)** | **$** | **36,980** |

|  | Week Ended 8/8/2010 | Week Ended 8/15/2010 | Week Ended 8/22/2010 | TOTAL |
|---|---|---|---|---|
| **CASH RECEIPTS** | | | | |
| RENTAL INCOME | $ 46,018 | $ 657 | $ — | $ 46,675 |
| PROPERTY INSURANCE INCOME | 44 | 44 | — | 89 |
| PROPERTY TAX INCOME | 111 | 111 | — | 223 |
| CAM | 6,874 | 110 | — | 6,984 |
| SALES TAX | 3,713 | 65 | — | 3,778 |
| PREPETITION AR COLLECTIONS | 617 | 7,890 | — | 8,507 |
| **TOTAL RECEIPTS** | $ 57,378 | $ 8,877 | $ — | $ 66,256 |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | |
| UTILITIES | $ — | $ 4,280 | $ — | $ 4,280 |
| UTILITY DEPOSITS | | | 2,140 | 2,140 |
| CAM | 13,502 | 300 | 71 | 13,873 |
| LEGAL & PROFESSIONAL | 1,111 | 1,111 | 833 | 3,056 |
| LEASE COMMISSION | | | | — |
| SALES TAX | | | 7,243 | 7,243 |
| **TOTAL EXPENDITURES FROM OPERATIONS** | 14,613 | 5,691 | 10,288 | 30,592 |
| **NET CASH FROM OPERATIONS** | 42,765 | 3,186 | (10,288) | 35,664 |

## CENTURY SHOPPES OF GROVE PARK
### WEEKLY CASH PROJECTION

|  | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | − | $ | 1,597 | $ | − | $ | 1,597 |
| PROPERTY INSURANCE INCOME | | − | | 65 | | − | | 65 |
| PROPERTY TAX INCOME | | − | | 99 | | − | | 99 |
| CAM | | − | | 100 | | − | | 100 |
| PREPETITION AR COLLECTIONS | | − | | − | | − | | − |
| DIP FINANCING | | 2,049 | | | | 4,773 | | 6,822 |
| **TOTAL RECEIPTS** | **$** | **2,049** | **$** | **1,861** | **$** | **4,773** | **$** | **8,683** |
| | | | | | | | | |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| UTILITIES | $ | − | $ | − | $ | 1,099 | $ | 1,099 |
| UTILITY DEPOSITS | | | | | | 550 | | 550 |
| CAM | | 938 | | 400 | | 2,640 | | 3,978 |
| LEGAL & PROFESSIONAL | | 1,111 | | 1,111 | | 833 | | 3,056 |
| **TOTAL EXPENDITURES FROM OPERATIONS** | **$** | **2,049** | **$** | **1,511** | **$** | **5,122** | **$** | **8,683** |
| **NET CASH FROM OPERATIONS** | **$** | **(0)** | **$** | **350** | **$** | **(349)** | **$** | **0** |

|  | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | - | $ | - | $ | - | $ | - |
| DIP FINANCING | | 1,111 | | 1,111 | | 833 | | 3,055 |
| TOTAL RECEIPTS | $ | 1,111 | $ | 1,111 | $ | 833 | $ | 3,055 |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| LEGAL & PROFESSIONAL | $ | 1,111 | $ | 1,111 | $ | 833 | $ | 3,055 |
| TOTAL EXPENDITURES FROM OPERATIONS | $ | 1,111 | $ | 1,111 | $ | 833 | $ | 3,055 |
| NET CASH FROM OPERATIONS | $ | (0) | $ | (0) | $ | - | $ | (0) |

## WALDEN WOODS III
## WEEKLY CASH PROJECTION

|  | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|---|---:|---|---:|---|---:|---|---:|---|
| **CASH RECEIPTS** | | | | | | | | |
| RENTAL INCOME | $ | 9,040 | $ | 202 | $ | 136 | $ | 9,378 |
| GUEST FEES | | 10 | | | | | | 10 |
| MOBILE HOME DEPOSITS NON-REFUNDABLE | | | | | | 11,000 | | 11,000 |
| MOBILE HOME SALES | | | | | | | | - |
| PREPETITION AR COLLECTIONS | | 448 | | - | | - | | 448 |
| DIP FINANCING | | 10,861 | | 20,613 | | 4,745 | | 36,219 |
| **TOTAL RECEIPTS** | **$** | **20,359** | **$** | **20,815** | **$** | **15,881** | **$** | **57,055** |
| | | | | | | | | |
| **CASH EXPENDITURES FROM OPERATIONS** | | | | | | | | |
| UTILITIES | $ | 1,148 | $ | 1,744 | $ | 1,148 | $ | 4,040 |
| LEASED EMPLOYEES - PAYROLL | | - | | - | | - | | - |
| INSURANCE | | - | | - | | 752 | | 752 |
| OPERATIONAL OTHER | | 8 | | 10 | | 2,177 | | 2,195 |
| LEGAL & PROFESSIONAL | | 1,111 | | 1,111 | | 833 | | 3,056 |
| REPAIRS & MAINTENANCE | | 1,492 | | - | | 1,975 | | 3,467 |
| SALES TAX | | | | | | 5,375 | | 5,375 |
| COST OF SALES | | 15,000 | | 15,000 | | - | | 30,000 |
| UTILITY DEPOSIT | | | | | | 2,020 | | 2,020 |
| SALES & MARKETING | | 1,600 | | 2,950 | | 1,600 | | 6,150 |
| | | | | | | | | |
| **TOTAL EXPENDITURES FROM OPERATIONS** | **$** | **20,359** | **$** | **20,815** | **$** | **15,880** | **$** | **57,054** |
| **NET CASH FROM OPERATIONS** | **$** | **(0)** | **$** | **0** | **$** | **0** | **$** | **0** |

## OP III, LLC
## WEEKLY CASH PROJECTION

|                         | Week Ended 8/8/2010 | | Week Ended 8/15/2010 | | Week Ended 8/22/2010 | | TOTAL | |
|-------------------------|------:|---|------:|---|------:|---|------:|---|
| **CASH RECEIPTS**       |       |   |       |   |       |   |       |   |
| RENTAL INCOME           | $ | – | $ | – | $ | – | $ | – |
| DIP FINANCING           |   | 1,111 |   | 1,111 |   | 833 |   | 3,055 |
| TOTAL RECEIPTS          | $ | 1,111 | $ | 1,111 | $ | 833 | $ | 3,055 |
|                         |   |   |   |   |   |   |   |   |
| **CASH EXPENDITURES**   |   |   |   |   |   |   |   |   |
| LEGAL & PROFESSIONAL    | $ | 1,111 | $ | 1,111 | $ | 833 | $ | 3,055 |
| TOTAL EXPENDITURES      | $ | 1,111 | $ | 1,111 | $ | 833 | $ | 3,055 |
|                         |   |   |   |   |   |   |   |   |
| **NET CASH**            | $ | (0) | $ | (0) | $ | – | $ | (0) |