# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                    **Chapter 11**

**Odyssey (III) DP XI, LLC**              **Case No.:  8:10-bk-18725-CPM**
**d/b/a Alexander Crossings,**

       **Debtor.**

_____/

# DISCLOSURE STATEMENT FOR
## ODYSSEY (III) DP XI, LLC D/B/A ALEXANDER CROSSINGS
## UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE

STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
Edward J. Peterson III (Florida Bar No. 0014612)
B. Michael Bachman (Florida Bar No. 0014139)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:     (813) 229-0144
Facsimile:      (813) 229-1811
Email:          epeterson@srbp.com
                 mbachman@srbp.com
Counsel for Debtor and Debtor in Possession

Tampa, Florida
Dated as of February 24, 2011

THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OF REORGANIZATION FOR ODYSSEY (III) DP XI, LLC (THE "**PLAN OF REORGANIZATION**" OR THE "**PLAN**"), AND NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DESCRIPTION OF THE DEBTOR'S PLAN OF REORGANIZATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. **EACH CREDITOR AND HOLDER OF AN INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.**

THE SOLICITATION OF ACCEPTANCES OF THE PLAN OR THE GIVING OF ANY INFORMATION OR THE MAKING OF ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS OR DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN IS NOT AUTHORIZED BY THE PLAN PROPONENT, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN WILL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. CREDITORS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE BANKRUPTCY DOCKET IN THE LEAD CASE IN ORDER TO EVALUATE EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING. **ALL CREDITORS THAT ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN OF REORGANIZATION AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION.**

IN THE EVENT THAT ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO REJECT THE PLAN (1) THE DEBTOR MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE SO-CALLED "CRAMDOWN" PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE (11 U.S.C. §1129(b)) AND, IF REQUIRED, MAY FURTHER AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN AS PROVIDED THEREIN. THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH UNDER THE CAPTION "VOTING ON AND CONFIRMATION OF THE PLAN."

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF INTERESTS. ALL CREDITORS AND HOLDERS OF INTERESTS ARE THEREFORE URGED TO VOTE IN FAVOR OF THE PLAN. INDEED, IT IS ANTICIPATED THAT HOLDERS OF ALLOWED UNSECURED CLAIMS WILL BE PAID IN FULL UNDER THE PLAN.** TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN THE TIME SET BY THE COURT.

## INDEX TO EXHIBITS TO
## DISCLOSURE STATEMENT

EXHIBIT A          Summary of Tenants of Alexander Crossings

EXHIBIT B          Projections

EXHIBIT C          Liquidation Analysis

4

## DISCLOSURE STATEMENT FOR
## ODYSSEY (III) DP XI, LLC

Odyssey (III) DP XI, LLC (the "**Debtor**"), the Debtor and Debtor in Possession in the Reorganization Case bearing Case Number 8:10-bk-18725, submits this Disclosure Statement pursuant to Section 1125 (11 U.S.C. §1125) of the Bankruptcy Code, 11 U.S.C. §101, *et seq.* (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Plan from holders of impaired Claims against the Debtor and the hearing on confirmation of the Plan of Reorganization for Odyssey (III) DP XI, LLC (the "**Plan**"), as scheduled by the Bankruptcy Court.

This Disclosure Statement is subject to the approval of the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of the holders of Claims of the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. Effort has been made to provide meanings of capitalized and other terms used in this Disclosure Statement. Reference is made to the Plan, however, for the actual meanings of all capitalized and other terms used in this Disclosure Statement and in the Plan and for controlling language with respect to any provision referenced in this Disclosure Statement or in the Plan. Terms used in this Disclosure Statement and in the Plan are defined in Article I of the Plan. In the event of a conflict between the definition of any term or any other provision contained in this Disclosure Statement and the corresponding definition or provision contained in the Plan, the definition or provision contained in the Plan shall control.

In the opinion of the Debtor, the treatment of Claims and Interests under the Plan contemplates a substantially greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor. If the Plan is not confirmed, there is a substantial likelihood that unsecured creditors will be left with no recovery at all.

The Debtor believes that confirmation of the Plan is clearly in the best interests of Creditors and Holders of Equity Interests, and strongly recommends that Creditors holding Allowed Claims in the Voting Classes vote to accept the Plan.

## PURPOSE OF DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Creditors of the Debtor with adequate information to make an informed judgment about the Plan. This information includes, among other things, the history of the Debtor prior to the filing of the Reorganization Case under Chapter 11, the events leading to the filing of the Reorganization Case, a brief summary of significant events to date in the Reorganization Case, and a summary explanation of how the Plan will function.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the confirmation of the Plan. All holders of Claims and Equity Interests are encouraged to carefully review this Disclosure Statement and the Plan.

## VOTING INSTRUCTIONS

### Who May Vote

Only the holders of Claims and Membership Interests that are deemed "allowed" under the Bankruptcy Code and that are "impaired" under the terms and provisions of the Plan (the **"Voting Classes"**) are permitted to vote to accept or reject the Plan. For purposes of the Plan, only the holders of Allowed Claims in the Voting Classes are impaired under the Plan and thus may vote to accept or reject the Plan. Under the Plan, the Claims classified in Classes 2, 3, 4, and 5 are impaired under the Plan and are entitled to vote to accept or reject the Plan and thus constitute the "Voting Classes" thereunder.

### How to Vote

Each holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and other exhibits, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the enclosed Ballot, including indicating your vote thereon with respect to the Plan, and return the Ballot as provided below. Please note that your vote and election cannot count unless you return the enclosed Ballot.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Kristi Cartagena at (813) 229-0144.

**YOU SHOULD COMPLETE AND SIGN THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO**

**LATER THAN 4:00 P.M. (EDT) ON THE DATE FIXED BY THE BANKRUPTCY COURT IN THE ENCLOSED ORDER APPROVING DISCLOSURE STATEMENT AND FIXING DATES FOR CONFIRMATION (THE "BALLOT DEADLINE").**

Completed Ballots should be sent by regular mail, hand delivery, or overnight delivery, **SO AS TO BE RECEIVED NO LATER THAN THE BALLOT DEADLINE,** to:

> Clerk of the United States Bankruptcy Court
> Sam M. Gibbons United States Courthouse
> 801 N. Florida Avenue, Suite 555
> Tampa, Florida 33602

A copy of the Ballot should also be sent to:

> Edward J. Peterson, III, Esquire
> Stichter Riedel Blain & Prosser, P.A.
> 110 E. Madison Street, Suite 200
> Tampa, Florida 33602

**Acceptance of Plan and Vote Required for Class Acceptance**

As the holder of an Allowed Claim in the Voting Classes, your vote on the Plan is extremely important. In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each impaired Class of Claims that are voted must be cast for the acceptance of the Plan. The Debtor is soliciting acceptances only from members of the Voting Classes. The Debtor or its agents may contact you with regard to your vote on the Plan.

To meet the requirement for confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code with respect to any impaired Class of Claims or Equity Interests which votes to reject the Plan (a **"Rejecting Class"**), the Debtor would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all holders of Claims in the Rejecting Class receive, under the Plan, property having a value equal to the full amount of their Allowed Claims.

**Confirmation Hearing**

The Bankruptcy Court will schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. The Bankruptcy Court has directed that any objection to confirmation of the Plan must be in writing and specify in detail the name and address of the objector, the basis for the objection and the specific grounds for the objection, and the amount of the Claim held by the objector. Consistent with Rule 3020(b) of the Federal Rules of Bankruptcy Procedure and Local Rule 3020-1(a), any such objection must be filed with the Bankruptcy Court and served upon each of the following parties, so as to be actually received on or before the deadline set by the Court:

| | |
|---|---|
| Debtor: | Edward J. Peterson, III, Esquire |
| | Stichter Riedel Blain & Prosser, P.A. |
| | 110 East Madison Street, Suite 200 |
| | Tampa, Florida 33602 |
| | |
| U.S. Trustee: | Benjamin E. Lambers, Esquire |
| | Assistant United States Trustee |
| | 501 East Polk Street, Suite 1200 |
| | Tampa, Florida 33602 |

## HISTORY OF THE DEBTOR

The Debtor is part of a larger enterprise of entities that are engaged in the business of developing, owning, and operating commercial properties, including anchored and unanchored retail centers, office buildings, flex and warehouse space, and self-storage centers, primarily in central Florida. The Debtor and hundreds of related companies are affiliates of Century Realty Funds, Inc., which is part of the Century Realty Funds Group (the "**CRF Group**") of privately held companies. The CRF Group has been in business since the 1970s and owns and manages commercial retail centers and office buildings, self-storage facilities, over 1,000 residential apartment units, over 7,200 manufactured home and recreational vehicle spaces, and 18 skilled health care facilities consisting of over 1,800 beds.

One facet of the CRF Group's operations is a group of entities doing business under the umbrella of the "Odyssey" name – denominated, for example, "Odyssey Operating Partnership, Ltd.", "Odyssey Operating Partnership II, Ltd.", "Odyssey Residential, Inc.," and so forth. The first of the Odyssey entities began doing business in 2005. These Odyssey entities are engaged in the commercial real estate business and collectively own and operate approximately sixty-two projects (each, a "**Project**"). Each Project is owned by a separate, special purpose limited liability company or partnership. Each Project is encumbered by first

mortgage secured debt.

The Debtor owns and operates Alexander Crossings, a 44,674 square foot retail and office complex also containing a 0.85 acre partially developed outparcel, located in Plant City, Florida. Alexander Crossings is located at the intersection of Alexander Crossings and U.S. Highway 39, a major retail hub of the city which is home to a Wal-Mart Supercenter Retail, Staples, a Publix Supermarket, Bealls, SweetBay Supermarket and Panera Bread, among others. The shopping center's current tenants include Watson Clinic, LLP, the Childrens Board of Hillsborough County, Plant City Dental, Physician's Weight Loss, and Plant City Learning Center, among others:



The Debtor is a wholly owned subsidiary of Odyssey Properties III, LLC ("**Odyssey III**"), an entity formed in 2006 to acquire existing and develop new commercial properties and which currently owns interests in approximately eleven special purpose entities that were formed to own certain Projects. As further discussed below, Odyssey III initially funded the completion of the Projects with Project-specific first mortgage loans from banks (often guaranteed by one or more individuals or entities), with approximately $29 million in proceeds raised through a private offering of notes by Odyssey III (the "**Investor Notes**"), and with the proceeds of loans from the CRF Group. Additional funding has been provided by the CRF Group over the past several years to permit continuation of interest payments on the Investor Notes and to supplement cash flow in connection with operating expenses or loan payments on Project loans.

## EVENTS LEADING TO THE FILING OF THE REORGANIZATION CASE

Prior to the Petition Date, the Debtor and its related entities were, for the most part, current on monthly loan payments on the underlying mortgage secured by the Projects, utilizing rental income and loans from the CRF Group or Lawrence W. Maxwell, its chairman, to do so. However, the Debtor and its related entities were faced with maturing loans or loans that had been declared in default on the basis of technical or non-monetary defaults, and they lacked the cash to pay the mortgages in full. The Debtor and related entities continued to make monthly payments to their secured lenders while they attempted to negotiate extensions or renewals and while they collectively searched for take out financing.

9

Beginning approximately two years ago, the Debtor and certain Affiliates began approaching lenders in an attempt to be proactive and to extend loan maturities and restructure the underlying mortgage debts. The response of the secured lenders was positive, with many lenders (including SunTrust Bank, N.A., RBC Bank, and Bank Atlantic), agreeing to renewals, extensions or restructurings of loans.

Absent such agreements, Chapter 11 remained the only, or at least the best, legal vehicle to fairly restructure debts. The declarations of default by BB&T, the Debtor's first mortgage lender, left the Debtor with no choice but to file a chapter 11 petition in an effort to preserve the value of its Project through a restructuring of the debt for the benefit of all creditors.

## SIGNIFICANT EVENTS TO DATE IN THE REORGANIZATION CASE

On August 2, 2010, the Debtor, along with Odyssey Properties III, LLC; Odyssey (III) DP XVII, LLC; Century (III) DP III, LLC; Odyssey (III) DP III, LLC; Century/AG – Avondale, LLC; Paradise Shoppes At Apollo Beach, LLC; CRF-Panther IX, LLC; GPP – Cobb, LLC; and Walden Woods III, Ltd. (together with the Debtor, the "**Odyssey Debtors**"), filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. On August 2, 2010, each of the Odyssey Debtors filed an Emergency Motion for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. On August 3, 2010, the Court entered orders jointly administering the cases for procedural purposes only under the lead case, *In re Odyssey Properties III, LLC,* Case No. 8:10-bk-18713-CPM.

On August 3, 2010, the Odyssey Debtors filed the following first day papers with the Court:

1. Application for Authorization to Employ Stichter, Riedel, Blain & Prosser, P.A., as Counsel for Debtors in Possession *Nunc Pro Tunc* to Petition Date;

2. Emergency Motion for Entry of Interim and Final Orders Authorizing use of Cash Collateral and Granting Replacement Lien Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure;

3. Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001;

4. Motion for Approval of Management Agreements and for Authority to Make Payments to Century Asset Management, Inc.;

5. Motion to Assume Engagement Agreement or Alternatively to Employ William Maloney and Bill Maloney Consulting as Chief Restructuring Officer *Nunc Pro Tunc* to August 2, 2010; and

6. Motion for Order Prohibiting Utilities from Altering, Refusing or Discontinuing Service on Account of Prepetition Invoices; Approving Debtors' Proposed Adequate Assurance of Payment; and Establishing Procedures for Determining Additional Requests for Adequate Assurance of Payment.

On August 27, 2010, the Bankruptcy Court entered its Order Granting in Part and Denying in Part Debtor's Motion to Assume Engagement Agreement or Alternatively to Employ William Maloney and Bill Maloney Consulting as Chief Restructuring Officer *Nunc Pro Tunc* to August 2, 2010. Further, on September 2, 2010, the Bankruptcy Court entered its Order Granting the Debtors' Motion for Approval of Management Agreements and for Authority to Make Payments to Century Asset Management, Inc. On September 2, 2010, the Bankruptcy Court entered its Order Approving the Debtors' Application for Authorization to Employ Stichter, Riedel, Blain & Prosser, P.A., as Counsel for Debtors in Possession *Nunc Pro Tunc* to Petition Date. In addition, on September 28, 2010, the Bankruptcy Court entered its Order Granting the Debtors' Motion for Order Prohibiting Utilities from Altering, Refusing or Discontinuing Service on Account of Prepetition Invoices; Approving Debtors' Proposed Adequate Assurance of Payment; and Establishing Procedures for Determining Additional Requests for Adequate Assurance of Payment.

On August 4, 2010, the Odyssey Debtors filed their Joint Chapter 11 Case Management Summary.

On August 6, 2010, BB&T filed its Objection to Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. 364(c) and (d) and F.R.B.P. 4001. On August 25, 2010, the Debtors filed their Notice of Filing Amended and Restated Term Sheet for Debtor-In-Possession Financing. On August 26, 2010, BB&T filed its Supplemental Objection to Debtors' Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001. On October 5, 2010, the Bankruptcy Court entered its Interim Order Granting Debtors' Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001

On August 9, 2010, BB&T filed its Limited Objection to Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing use of Cash Collateral and Granting Replacement Lien Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure. On August 11, 2010, the Bankruptcy Court entered its Interim Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing use of Cash Collateral and Granting Replacement Lien Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure. On October 4, 2010, the Bankruptcy Court entered its Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing use of Cash Collateral and Granting Replacement Lien Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure. On January 19, 2011, the Bankruptcy Court entered its Final Order Granting Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing use of Cash Collateral and Granting Replacement Lien Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure

On September 8, 2010, BB&T filed its Motion for Entry of Order Determining that Certain Jointly Administered Debtors are Subject to Single Asset Real Estate Provisions of the Bankruptcy Code. On October 1, 2010, the Odyssey Debtors filed their Omnibus Response and Objection to Motions for the Entry of an Order Determining that Certain Debtors are Subject to the Single Asset Provisions of the Bankruptcy Code filed by Wells Fargo Bank, N.A. and Branch Banking and Trust Company. On November 22, 2010, the Bankruptcy Court entered its Order Granting BB&T's Motion for Entry of an Order Determining that Certain Jointly Administered Debtors are Subject to the Single Asset Real Estate Provisions of the Bankruptcy Code.

On November 24, 2010, the Odyssey Debtors filed the Agreed Motion for Extension of Periods of Debtor's Exclusive Right to File Chapter 11 Plan and to Solicit Acceptances. On January 25, 2010, the Bankruptcy Court entered its Order Granting the Odyssey Debtors' Motion for Extension of Periods of Debtor's Exclusive Right to File Chapter 11 Plan and to Solicit Acceptances. On January 28, 2011, Odyssey (III) DP XI, LLC filed its Second Motion for Extension of Periods of Debtor's Exclusive Right to File Chapter 11 Plan and to Solicit Acceptances. On February 7, 2011, BB&T filed its Response and Memorandum of Law In Opposition to Second Motion of Debtor Odyssey (III) DP XI, LLC for Extension of Periods of Debtor's Exclusive Right to File Chapter 11 Plan and to Solicit Acceptances.

On February 3, 2011, with respect to the Debtor, BB&T filed its Motion for Relief from Stay with Supporting Memorandum of Law. A preliminary hearing on the motion is scheduled for February 25, 2011.

## SUMMARY OF FINANCIAL PERFORMANCE
## TO DATE IN THE REORGANIZATION CASE

At the time the Debtor filed the Reorganization Case, it was enjoying steady net operating income from the market rents it was collecting from then current commercial tenants, including those listed above. Since the Petition Date, the Debtor has not only retained all but one of its tenants, but also has successfully identified additional prospective tenants and negotiated three (3) new leases. In addition, many tenants have entered the "rent commencement date" portions of their leases and have begun making monthly payments to the Debtor pursuant to their respective lease terms. Additional tenants' "free rent" periods are set to expire in the coming months and they will soon begin remitting monthly rental payments as well. Attached hereto as Exhibit A is a summary of all of the Debtor's available spaces, tenants and respective lease commencement and expiration dates for each lease.

At this time, only three (3) spaces remain vacant at Alexander Crossings. However, these spaces are estimated to be leased to new tenants in February, March and April, respectively, of this year. The Debtor, through its management, has successfully increased occupancy in the shopping center and is on track to achieve one hundred percent (100%) occupancy within the next few months—a remarkable feat in this economy. The Project's strategic location at the intersection of Alexander Crossings and U.S. Highway 39 in Plant City continues to make this center an attractive location for prospective and existing tenants.

The Debtor has also utilized its management company to cut costs where possible and to market the Project effectively. Further, projections indicate that the Project is likely to realize a total net operating income for 2011 of $388,105, over a sixty five percent (65%) increase from the $235,000 net operating income realized in calendar year 2010.

## SUMMARY OF PLAN OF REORGANIZATION

### Introduction

The Debtor believes that the Plan provides the greatest possible recovery to the Debtor's Creditors. The Debtor therefore believes that acceptance of the Plan is in the best interest of each and every Class of Claims and Equity Interests and recommends that the Voting Classes vote to accept the Plan.

A summary of the principal provisions of the Plan is set forth below. This summary is qualified in its entirety by reference to the provisions of the Plan and, to the extent there is any conflict between this summary and the Plan, the language of the Plan will govern. All terms stated in initial capital letters in this summary are defined in the Plan.

Claims and Membership Interests will be treated under the Plan in the manner set forth in Article 5 of the Plan. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Membership Interests pursuant to the Plan will be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Membership Interests.

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

*Administrative Expenses.* Except as otherwise provided below and subject to the provisions of Article 7.1 of the Plan which provides for the payment of Allowed Cure Claims (including the portion of said Allowed Cure Claims that constitute Allowed Administrative Expenses) on or before the date that is 120 days after the Effective Date, each Holder of an Allowed Administrative Expense will be paid (a) on the Effective Date, an amount, in Cash, equal to the Allowed Amount of its Administrative Expense, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense and the Debtor or Reorganized Debtor.

*Priority Tax Claims.* Each Holder of an Allowed Priority Tax Claim will be paid (a) an amount, in Cash, equal to the Allowed Amount of its Priority Tax Claim, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor.

## TREATMENT OF CLASSIFIED CLAIMS AND MEMBERSHIP INTERESTS

*In General.* Claims and Membership Interests will be treated under the Plan in the manner set forth in Article 5 of the Plan. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Membership Interests pursuant to the Plan will be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims, of any nature whatsoever, and Allowed Membership Interests.

*Unclassified Claims.* Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth in Article 3 of the Plan.

### Class 1: Priority Claims.

Class 1 consists of all Priority Claims. Each Holder of an Allowed Priority Claim shall be paid (a) on the Distribution Date, an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the Debtor or the Reorganized Debtor. Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### Class 2: Secured Claims and Other Claims of BB&T.

Class 2 consists of all Allowed BB&T Prepetition Claims.

BB&T shall retain its liens on the Alexander Crossings Project, the rents generated therefrom, and upon the Tenant Improvement Cash Reserve Fund to be created under this Plan.

The Allowed BB&T Prepetition Claims in an amount not to exceed $6,000,777.38, based on the BB&T Prepetition Loan Documents shall be paid in full, with payments beginning thirty days after the Effective Date, as set forth in the Projections.

Beginning on the date that is thirty days after the Effective Date and on a monthly basis for eleven months thereafter (for a total of 12 months), the Debtor shall pay to BB&T interest only payments calculated at the annual rate of five percent (5%) (or such other rate as the Court deems fair and equitable).

Beginning in the thirteenth month following the Effective Date, the Debtor shall make payments of principal and interest at the annual rate of five percent (5%) (or such other rate as the Court deems to be fair and equitable), amortized over thirty years (or such other term as the Court deems fair and equitable), with a balloon payment due in the 61st month after the Effective Date (or such other term as the Court deems to be fair and equitable).

The Debtor shall place a deed in lieu of foreclosure in escrow. Such deed shall not be released unless a default occurs under the Plan. In order to reduce risk for BB&T, in the event of a default that is not timely cured, the Debtor will not contest the release of the deed in lieu of foreclosure or, alternatively, will consent to foreclosure in the event that BB&T elects to foreclose.

The Debtor will provide the Court and BB&T modified loan documents containing the modified terms as set forth herein, or as have been determined by the Court to be fair and equitable.

The Debtor shall be in default under the restructured loan documents upon the occurrence of the following: A failure to make payments, failure to maintain insurance, and failure to pay taxes. The Debtor shall have thirty days from the notice of default to cure the default.

Any state court actions against the Debtor shall be dismissed.

Notwithstanding the above, BB&T may be paid under such other terms as may be agreed upon by BB&T and the Debtor or the Reorganized Debtor, as the case may be.

Class 2 is Impaired by the Plan. BB&T, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

### Class 3: Secured Tax Claims of Governmental Units.

Class 3 consists of all Secured Tax Claims of Governmental Units. Each Holder of an Allowed Secured Tax Claim shall be paid (a) on the Distribution Date, an amount in Cash by the Reorganized Debtor equal to the Allowed Amount of its Secured Tax Claim in accordance with Section 1129(a)(9)(D) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Secured Tax Claim and the Debtor or Reorganized Debtor. Class 3 is Impaired by the Plan. Each Holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

### Class 4: Other Secured Claims.

Class 4 consists of all Secured Claims not otherwise specifically classified in the Plan. In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 4. Under the Plan, the following shall occur with respect to the Allowed Class 4 Claims:

The Holders of Allowed Other Secured Claims, if any, shall receive either their Collateral or the value of their Collateral in full and final satisfaction of the Secured Claim.

Notwithstanding the foregoing provisions, the Reorganized Debtor, in its sole discretion, may return to the Secured Creditor any Property securing its Secured Claim in full and final satisfaction of the Secured Claim.

Any deficiency owing to a Secured Creditor with respect to a Class 4 Claim shall be classified and treated as a Class 5 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.

Class 4 is Impaired by the Plan. Each Holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.

**Class 5: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

Class 5 consists of all Unsecured Claims not otherwise classified in the Plan.

Under the Plan, Holders of Allowed Class 5 Claims shall be paid in full from a fund, the source of which shall be the excess cash flow of business operations after debt service and expenses, payable in equal yearly payments, beginning on the date that is thirty (30) days after the first anniversary of the Effective Date and thereafter on an annual basis until paid in full. It is anticipated that the Holders of Allowed Unsecured Claims will be paid in full within the first two years after the Effective Date.

The timing and procedures for, and amount of, distributions to Holders of Allowed Class 5 Claims shall be in accordance with Article 9 of the Plan, the Confirmation Order, and Projections.

Class 5 is Impaired by the Plan. Each Holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

**Class 6: Equity Interests.**

Class 6 consists of all Equity Interests. The Equity Interests will not be affected by the Plan and the Member will retain the Equity Interests. No Distributions will be made under the Plan on account of the Equity Interests. Class 6 is Unimpaired by the Plan. The Member, as the Holder of the Class 6 Equity Interests, conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.


## ACCEPTANCE OR REJECTION OF PLAN

**Each Impaired Class Entitled to Vote Separately.**

Except as otherwise provided in Article 6.4 of the Plan, the Holders of Claims or Equity Interests in each Impaired Class of Claims or Impaired Class of Equity Interests shall be entitled to vote separately to accept or reject the Plan.

**Acceptance by Impaired Classes.**

Classes 2, 3, 4 and 5 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such

Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

## Presumed Acceptance of Plan by Unimpaired Classes.

Classes 1 and 6 are Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, such Classes and the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Accordingly, votes of Holders of Claims in Classes 1 and 6 are not being solicited by the Debtor. Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the Debtor or the Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## Impairment Controversies.

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## Assumption or Rejection of Executory Contracts and Unexpired Leases.

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (i) all executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and that are listed on Exhibit A attached to the Plan shall be deemed assumed by the Debtor as of the Effective Date, and (ii) all other executory contracts and unexpired leases that currently exist between the Debtor and another Person or Entity and that are not listed on Exhibit B attached to the Plan shall be deemed assumed by the Debtor as of the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the Debtor reserves

the right, on or prior to the Confirmation Date, to amend Exhibit B of the Plan to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be rejected (if added) or assumed (if deleted). The Debtor shall provide notice of any amendments to Exhibit B of the Plan to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit B of the Plan shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder. Any executory contract or unexpired lease that exists between the Debtor and another Person or Entity and that is listed on Exhibit B attached to the Plan shall be deemed rejected by the Debtor as of the Confirmation Date (collectively, the "Rejected Contracts"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtor shall be deemed to be executory contracts and Assumed Contracts, and (ii) all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by the Debtor for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on Exhibit B of the Plan).

## Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 hereof, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by the Debtor of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

### Inclusiveness.

Unless otherwise specified on Exhibit A or Exhibit B of the Plan, each executory contract and unexpired lease listed or to be listed on Exhibit A or Exhibit B of the Plan shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner

affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit A or Exhibit B of the Plan.

## Cure of Defaults.

Any lessor, lessee, or other party to an Assumed Contract (except those lessors, lessees, or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1 of the Plan, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor or the Reorganized Debtor. The Reorganized Debtor shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than one hundred eighty (180) days following the Effective Date, the Reorganized Debtor shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto or as may otherwise be agreed to by the parties. As of the date of the Plan, the Debtor does not believe there will be any Cure Claims.

## Claims under Rejected Executory Contracts and Unexpired Leases.

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor or the Reorganized Debtor. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 5.

**Insurance Policies.**

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or the Reorganized Debtor may hold against any Person or Entity, including the insurers under any of the Debtor's insurance policies.

**Indemnification Rights.**

All Claims for Indemnification Rights against the Debtor by an Indemnitee for defense and indemnification shall be reinstated against the Reorganized Debtor and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the Debtor, but only to the extent that any such reinstated Claim for defense and indemnification in response to a claim against such Indemnitee is covered under any of the Debtor's insurance policies. The reinstated Claim against the Reorganized Debtor, and the Reorganized Debtor's corresponding defense and indemnification obligation, shall not be for any deductible or self-insured retention amount and shall not exceed the amount of available insurance coverage.

## MEANS OF IMPLEMENTATION AND EXECUTION OF PLAN

**General Overview of the Plan.**

The Plan provides for the continued operation of the Debtor as the Reorganized Debtor. The Plan provides for Cash payments to Holders of Allowed Claims, except Holders of Equity Interests, all as more particularly described in Articles 3 and 5 of the Plan.

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of the Reorganized Debtor, including funds to be received from the Plan Contribution, as shown on the Projections. At the present time, the Debtor believes that the Reorganized Debtor will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan.

**Effective Date Actions.**

Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 10.2 of the Plan, on or as of the Effective Date, the Plan shall be implemented and the following actions shall thereafter immediately occur:

the Reorganized Debtor shall make the Initial Distribution as provided in Article 9.1 of the Plan; and

the Reorganized Debtor shall carry out its other Effective Date responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Plan and the Plan Documents.

## Vesting of Property of the Estate in the Reorganized Debtor.

On the Effective Date, except as otherwise expressly provided in the Plan, all Property of the Estate (including the Causes of Action and any net operating losses) shall vest in the Reorganized Debtor free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtor intends to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of its Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtor's Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtor.

## Continued Corporate Existence; Dissolution.

The Debtor will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a limited liability company under Florida Law and pursuant to its organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

## Corporate Action.

All matters provided for under the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, or any corporate action to be taken by or required of the Debtor or the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Member and Manager of the Debtor or the Reorganized Debtor.

## Boards of Directors and Executive Officers of the Reorganized Debtor.

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the executive officers or managers of the Debtor immediately prior to the Effective Date (with the exception of the chief restructuring officer) shall be deemed to be the executive officers or managers of the Reorganized Debtor without any further action by any party. Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Debtor has disclosed, in the Disclosure Statement, the identity and affiliation of any individual proposed to serve as an initial executive officer or manager of the Reorganized Debtor and, to the extent such individual is an insider other than by virtue of being an officer, the nature of any compensation for such individual. Larry Maxwell will continue to serve as an officer of the Manager.

On and after the Effective Date, the operations of the Reorganized Debtor shall continue to be the responsibility of the Manager. Each executive officer and manager of the Reorganized Debtor shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the organizational documents of the Reorganized Debtor.

From and after the Confirmation Date, the executive officers and managers of the Debtor and the Reorganized Debtor, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

To the extent that, as of the Effective Date, the Debtor has in place employment, indemnification and other agreements with its officers and employees who will continue in such capacities after the Effective Date, such agreements shall remain in place after the Effective Date, and the Reorganized Debtor will continue to honor such agreements, except as otherwise provided in the Plan. Such agreements may include equity, bonus and other incentive plans in which officers and other employees of the Reorganized Debtor may be eligible to participate.

## Section 1146 Exemption.

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security, or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtor or its Estate or the Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental

officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Pursuit of Causes of Action.**

On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtor, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.13 of the Plan. The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtor states that any party in interest that engaged in business or other transactions with the Debtor Prepetition or that received payments from the Debtor Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. The Reorganized Debtor will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED DEBTOR. Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtor to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or Reorganized Debtor does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of the Reorganized Debtor. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

24

The Debtor does not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

At this time, the Debtor believes the Causes of Action consist primarily of the Avoidance Actions. Because the Plan is premised on the Debtor' solvency and provides for payment in full of all Allowed Claims of Creditors, with interest, at the present time, the Debtor anticipates that no Avoidance Actions will be pursued.

The Debtor and the Reorganized Debtor reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

The Estate shall remain open, even if the Bankruptcy Case shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the Causes of Action Recoveries have been received by the Reorganized Debtor.

## Prosecution and Settlement of Claims and Causes of Action.

The Reorganized Debtor (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Reorganized Debtor shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $25,000.00, then the Reorganized Debtor may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee and the Notice Parties of the terms of the settlement agreement; provided, however, that if the United States Trustee or the Notice Parties indicate their approval or do not provide the Reorganized Debtor with an objection to the proposed settlement within ten

(10) days after it receives notice of such settlement in writing, then the Reorganized Debtor shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee or the Notice Parties to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $25,000.00, then the Reorganized Debtor shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

**Effectuating Documents; Further Transactions.**

Prior to the Effective Date, each of the chief executive officer, president, chief financial officer, or secretary of the Debtor (and, on and after the Effective Date, each of the chief executive officer, president, chief financial officer, or secretary of the Reorganized Debtor) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

## PROVISIONS GOVERNING DISTRIBUTION

**Initial Distribution.**

As soon as reasonably practicable (as determined by the Reorganized Debtor) after the Effective Date, the Reorganized Debtor shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Class 1; provided, however, that the Distributions as to Allowed Administrative Expense Claims of Professionals shall be made no more than ten (10) days after the Effective Date, or as otherwise agreed to by the Professionals (the "Initial Distribution"). Thereafter, the Reorganized Debtor shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

## Execution and Delivery of Plan Notes and Security Documents.

On the Effective Date or the Determination Date, as the case may be, the Reorganized Debtor shall execute and deliver the Plan Documents.

## Determination of Claims.

From and after the Effective Date, the Reorganized Debtor shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Debtor or Reorganized Debtor), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 5 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Debtor receives actual notice of the filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtor or Reorganized Debtor, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any

objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

## Distributions as to Allowed Claims in Class 5.

Each Holder of an Allowed Unsecured Claim in Class 5 shall receive a Cash Distribution, on the applicable Distribution Date, in the amount provided for in Article 5 of the Plan.

Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 5 unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Class 5 Claim, the Holder of such Allowed Class 5 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 5 Claim is subject to a proceeding against it by Reorganized Debtor under Section 502(d) of the Bankruptcy Code, then Reorganized Debtor (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

Distributions to a Holder of an Allowed Claim in Class 5 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtor or Reorganized Debtor at the time of the Distribution, unless Reorganized Debtor has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized Debtor shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

## Unclaimed Distributions.

If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Debtor shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized Debtor due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized Debtor as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

Any unclaimed Distribution as described above sent by Reorganized Debtor shall become the property of Reorganized Debtor.

## Transfer of Claim.

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise Reorganized Debtor in writing of such transfer and provide sufficient written evidence of such transfer. Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until Reorganized Debtor shall have received written notice to the contrary. Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, Reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

## One Distribution Per Holder.

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

## Effect of Pre-Confirmation Distributions.

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor or Reorganized Debtor to such Holder under the Plan.

## No Interest on Claims.

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition Interest or the payment of Postpetition Interest, penalties, or late charges on account of such Allowed Claim for any purpose. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

## Compliance with Tax Requirements.

In connection with the Plan, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## DISCHARGE, RELEASE, LIMITATION
## OF LIABILITY, AND GENERAL INJUNCTION

### Discharge of Claims.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtor and its Estate and the Reorganized Debtor from any and all Debts of and Claims of any nature whatsoever against the Debtor that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective

Date, the Debtor and its Estate and the Reorganized Debtor, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor or its Estate or the Reorganized Debtor, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect. As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests, except as otherwise expressly provided in the Plan. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt. Notwithstanding the foregoing, Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan.

## Exculpation from Liability.

The Debtor and its respective Postpetition officers, including the chief restructuring officer, the Professionals for the Debtor (acting in such capacity), and the DIP Lender (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such

31

Professionals during the Bankruptcy Case. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under Article 11.2 of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.2 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

**General Injunction.**

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtor or the Reorganized Debtor or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or the Reorganized Debtor or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor or the Reorganized Debtor or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor or the Reorganized Debtor under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtor and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of Article 11.3 of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

## Term of Certain Injunctions and Automatic Stay.

All injunctions or automatic stays for the benefit of the Debtor pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtor' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtor affirmatively elects to have the Debtor's liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtor affirmatively elects to have the automatic stay lifted and to have the Debtor's liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtor as provided herein.

## No Liability for Tax Claims.

Unless a taxing Governmental Unit has asserted a Claim against the Debtor before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtor, the Reorganized Debtor or their respective officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## MISCELLANEOUS PROVISIONS

***Retention of Jurisdiction.*** The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes relating to Claims, Equity Interests, and other issues presented by or arising under the Plan. The Bankruptcy Court will also retain jurisdiction under the Plan for any actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby. *See* Article 12 of the Plan for a more detailed description.

*Confirmation Order and Plan Control.* To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor and any third party, unless otherwise expressly provided in the Plan, the Plan controls the Disclosure Statement and any such agreements, and the Confirmation Order (any and other orders of the Court) will be construed together and consistent with the terms of the Plan.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

*General*

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtor and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTOR'S GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

*General Federal Income Tax Consequences to Holders*

*In General.* The following discussion addresses certain of the material consequences of the Plan to Holders. Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual,

corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders of Claims and Equity Interests.* The Holders of Claims against and Equity Interests in the Debtor are urged to consult with their tax advisors as to the consequences of the Plan to them. Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(1) The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(2) The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtor and the character of that gain or loss.

(3) The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(4) Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(5) The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(6) The effect of a Holder of a Claim or Equity Interest receiving a deferred distribution or distribution that is contingent in amount.

### Certain Federal Income Tax Consequences to the Debtor

*Cancellation of Indebtedness Income.* Generally, cancellation of indebtedness triggers ordinary income to a debtor equal to the adjusted issue price (as determined for federal income tax purposes) of the indebtedness cancelled. If debt is discharged in a Chapter 11 case, however, a debtor does not recognize cancellation of indebtedness income. Instead, certain tax attributes otherwise available to the debtor are reduced by the amount of the indebtedness cancelled. Tax attributes subject to reduction include: (i) net operating losses (NOL) and NOL carryforwards; (ii) most credit carryforwards; (iii) capital losses and carryforwards; (iv) the tax basis of the debtor's depreciable and non-depreciable assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryforwards.

Under Sections 108(b) and 1017 of the Tax Code, attributes are reduced in the following order: first, net operating loss carryover; second, general business credit carryovers; third, capital loss carryovers; and fourth, tax basis. In lieu of reducing net operating loss and carryovers, the taxpayer can elect to reduce tax basis first. Such an election shall not apply to an amount greater than the aggregate adjusted bases of depreciable property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

Therefore, any cancellation of indebtedness income realized by the Debtor would require a reduction in their NOLs or other tax attributes. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, however, the realization of substantial amounts of cancellation of indebtedness income as a result of implementation of the Plan should not diminish the NOLs and NOL carryforwards otherwise available to offset other income recognized in the year in which the Plan is consummated.

Additionally, any sale of Collateral pursuant to the Plan may result in taxable income to the Debtor if the tax basis in the Collateral is less than the sales price.

The Debtor does not believe that a principal purpose of the Plan is the avoidance of federal income tax within the meaning of Section 269 of the Internal Revenue Code.

### *Importance of Obtaining Professional Tax Assistance*

This discussion is intended only as a summary of certain federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances. Accordingly, Holders are urged to consult with their tax advisors about the federal, state, local and foreign tax consequences of the Plan.

## VOTING ON AND CONFIRMATION OF THE PLAN

### *Confirmation and Acceptance by All Impaired Classes*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility.* A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtor believes and the projections attached hereto support the Debtor's ability to perform their obligations under the Plan without further financial reorganization.

The Plan basically provides for payment to Holders of Allowed Claims, including contingent, unliquidated, and Disputed Claims to the extent they become Allowed Claims, in the order of their priority. Accordingly, the Debtor believes that the Plan is *per se* feasible.

The obligations under the Plan to Holders of contingent, unliquidated, and Disputed Claims cannot be ascertained without the determination of the validity and amount of those Claims by the Bankruptcy Court. Until the Claim determination process is complete, the exact amount to be received by Unsecured Creditors cannot be ascertained.

***Best Interests Standard***. The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtor was liquidated under Chapter 7 on the same date. The Debtor believes that the liquidation analysis attached hereto demonstrates that distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7 as no funds would be available to unsecured creditors in the event of a Chapter 7 liquidation. IT IS ANTICIPATED THAT HOLDERS OF ALLOWED UNSECURED CLAIMS WILL BE PAID IN FULL UNDER THE PLAN.

### Confirmation Without Acceptance by All Impaired Classes

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

***Discriminate Unfairly***. The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

***Fair and Equitable Standard***. The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution. The Debtor believes the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a

value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the Holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. The Debtor believes that the Plan meets these standards.

The Debtor intends to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

### *Absolute Priority Rule*

The Bankruptcy Code and other applicable law establish the priority for distribution of funds in bankruptcy cases. These priority provisions are sometimes referred to as the "absolute priority" rule. Normally, and subject to exceptions not relevant here, valid secured claims are first paid to the extent of the amount of the claim or the value of the claimant's collateral (if less than the claim).

Any property in the Estate, net of the valid secured claims described above, is first distributed to holders of priority claims, including (a) the costs of administering the Reorganization Case; (b) certain wage and benefit claims; and (c) certain tax claims. After payment of priority claims, unsecured creditors share pro rata in the remaining funds until paid in full. Equity holders (i.e., stockholders) are paid only after all creditors have been paid.

### *Non-Confirmation of the Plan*

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7. In a Chapter 7 case, the Debtor's assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration, and the payment of priority claims.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Estate.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

### *Alternative Plans of Reorganization*

If the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan or plans. The Debtor believes that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

### *Liquidation under Chapter 7 or Chapter 11*

If a plan is not confirmed, the Reorganization Case may be converted to a Chapter 7 liquidation case. In a Chapter 7 case, a trustee would be appointed to liquidate the assets of the Debtor. Converting the case to Chapter 7 would simply add an additional layer of administrative expenses to the Estate which would eliminate any funds available for distribution to Unsecured Creditors. The proceeds of the liquidation would be distributed to the Creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code.

In general, the Debtor believes that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) failure to realize the full value of the Debtor's assets; (d) the inability to utilize the work-product and knowledge of the Debtor and its Professionals; (e) the substantial delay which would elapse before Creditors would receive any distribution in respect of their Claims; and (f) the loss to Unsecured Creditors.

The Debtor believes that the Plan is superior to liquidation under Chapter 7 or Chapter 11.

## SUMMARY, RECOMMENDATION AND CONCLUSION

The Debtor believes that the Plan is in the best interests of all Creditors. It is anticipated the Holders of Allowed Unsecured Claims will be paid in full. In the event of a liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, the Debtor believes there would be little or no distribution to Unsecured Creditors. For these reasons, the Debtor urges that the Plan is in the best interests of all Creditors and that the Plan be accepted.

*/s/ Edward J. Peterson, III*

Edward J. Peterson III
Florida Bar No. 0014612
B. Michael Bachman
Florida Bar No. 0014139
STICHTER, RIEDEL, BLAIN
  & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:   (813) 229-0144
Facsimile:    (813) 229-1811
Email:       epeterson@srbp.com
           mbachman@srbp.com
Counsel for Debtor and Debtor in Possession

# EXHIBIT A

**Summary of Tenants of Alexander Crossings**

| Unit | Tenant | Business | Unit Square foot | Lease Commencement Date | Lease Exp. Date |
|------|--------|----------|------------------|-------------------------|-----------------|
| A1 | Kaleidoscope Kids Learning Center | Learning Center | 840 | 8/1/2010 | 7/31/2011 |
| A2 | Studio Three | Beauty Salon and Spa | 1,226 | 6/1/2008 | 5/31/2013 |
| A3 | Physician's Weight Loss Center | Weight Loss Center | 1,213 | 12/12/2008 | 12/31/2011 |
| A4 | Plant City Discount Pharmacy | Pharmacy | 1,213 | 8/18/2010 | 1/31/2013 |
| A7 | Watson Clinic | Hospital | 8,179 | 12/1/2009 | 5/31/2015 |
| A8 | Select Medical | Physical & occupational therapy office | 2,426 | 12/1/2008 | 3/31/2014 |
| A10 | Plant City Dental | Dentist | 2,443 | 9/17/2009 | 9/30/2014 |
| A11 | Vacant ESTIMATED TO BE LEASED Apr-11 | Vacant | 1,157 | | |
| A12 | Peace Love Play | | 1,283 | 7/1/2010 | 3/31/2013 |
| A13 | Vacant ESTIMATED TO BE LEASED Mar-11 | Vacant | 1,497 | | |
| A14 | Vacant ESTIMATED TO BE LEASED Feb-11 | Vacant | 1,254 | | |
| B1 | The Children's Board of Hillsborough County | Non-profit office providing family services | 2,900 | 8/8/2008 | 8/31/2013 |
| B3 | Beverly's Consignment Wearhouse | Clothing consignment shop | 1,483 | 2/4/2008 | 2/28/2011 |
| B4 | AAA Guns & Ammo | | 1,483 | 5/1/2010 | 12/31/2013 |
| B5 | All About Graphix | Graphics Design | 1,483 | 9/1/2010 | 8/31/2013 |
| B6 | Interior Solutions | | 1,483 | 12/22/2009 | 12/31/2011 |
| B7 | Kids mPowered | Children's Speech Therapy & Tutoring Clinic | 1,483 | 3/1/2008 | 2/28/2013 |
| B8 | New Florida Wrestling | Wrestling School & Tournaments | 2,628 | Upon turnover | |
| C1 | Plant City Learning Center | Day Care | 9,000 | 12/1/2009 | 11/30/2011 |
| | | | Total Square Feet 44,674 | | |

# EXHIBIT B

## Projections

## ODYSSEY (III) DP XI, LLC
## ALEXANDER CROSSINGS

| | YEAR 1<br>2011<br>PROJECTED | YEAR 2<br>2012<br>PROJECTED | YEAR 3<br>2013<br>PROJECTED | YEAR 4<br>2014<br>PROJECTED | YEAR 5<br>2015<br>PROJECTED |
|---|---|---|---|---|---|
| **REVENUES** | | | | | |
| RENTAL INCOME | 511,843 | 527,198 | 543,014 | 559,305 | 576,084 |
| PROPERTY INSURANCE INCOME | 16,165 | 16,812 | 17,485 | 18,184 | 18,911 |
| PROPERTY TAX INCOME | 25,570 | 26,337 | 27,127 | 27,941 | 28,779 |
| CAM | 59,623 | 61,411 | 63,254 | 65,151 | 67,106 |
| UTILITIES INCOME | 16,714 | 17,215 | 17,731 | 18,263 | 18,811 |
| MISCELLANEOUS | 500 | 500 | 500 | 500 | 500 |
| VACANCY ALLOWANCE | (31,521) | (32,474) | (33,456) | (34,467) | (35,510) |
| TOTAL INCOME | 598,894 | 617,000 | 635,655 | 654,877 | 674,682 |
| | | | | | |
| **EXPENSES** | | | | | |
| ADVERTISING/MARKETING | 2,020 | 2,020 | 2,020 | 2,020 | 2,020 |
| CAM EXPENSE | 84,184 | 84,904 | 85,646 | 86,410 | 87,197 |
| TRASH REMOVAL | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| UTILITIES | 5,892 | 5,892 | 5,892 | 5,892 | 5,892 |
| FILING FEES | 148 | 148 | 148 | 148 | 148 |
| INSURANCE | 20,292 | 21,104 | 21,948 | 22,826 | 23,739 |
| LEGAL & PROFESSIONAL FEES | 20,000 | 500 | 500 | 500 | 500 |
| TAXES-REAL ESTATE | 62,244 | 62,244 | 62,244 | 62,244 | 62,244 |
| REPAIRS & MAINTENANCE | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 |
| TOTAL OPERATING EXPENSES | 210,789 | 192,820 | 194,406 | 196,048 | 197,748 |
| | | | | | |
| INCOME (LOSS) FROM OPERATIONS | 388,105 | 424,179 | 441,249 | 458,829 | 476,934 |
| | | | | | |
| DEBT SERVICE | | | | | |
| INTEREST | 300,039 | 298,009 | 293,499 | 288,738 | 283,733 |
| PRINCIPAL | | 88,553 | 93,063 | 97,824 | 102,829 |
| TI CASH RESERVE FUND | 51,101 | | 33,213 | 14,607 | 24,537 |
| PAYMENT TO UNSECURED CREDITORS | 14,705 | 14,705 | | | |
| NET CASH | 22,260 | 22,913 | 21,474 | 57,660 | 65,835 |
| | | | | | |
| MULTIPLIER | | | | | |
| REVENUES | | 1.03 | 1.03 | 1.03 | 1.03 |
| INSURANCE REVENUE | | 1.04 | 1.04 | 1.04 | 1.04 |
| EXPENSES | | | | | |
| OPERATING | | 1.00 | 1.00 | 1.00 | 1.00 |
| INSURANCE | | 1.04 | 1.04 | 1.04 | 1.04 |
| REAL ESTATE TAX | | 1.00 | 1.00 | 1.00 | 1.00 |

| | |
|---|---|
| CURRENT LOAN AMOUNT | 5,875,220 |
| CLAIM AMOUNT | 6,000,777 |
| AS IS VALUE | 4,505,000 |
| Note - Claim Amount | 6,000,777 |
| Interest at 5.00% | 300,039 |
| 30 year Amort at 5.00% P&I | 386,562 |

TI CASH RESERVE FUND

    2011 $50,000 will be deposited in account

    2011 is the actual vacancies at 2/15/11 at $20/sq. ft. + 30% of leases in expiring in 1 year at $10/sq.ft.

    2012 - 2015 is calculated at 30% of leases expiring in 1 year at $10/sq.ft.

    2016 - 2017 is calcualted at estimated a vacancy of 10% mulitiplied by $10/sq.ft.

# EXHIBIT C

## Liquidation Analysis

| | Estimated Fair Market Value | Liquidation Value in Chapter 7 | Ref |
|---|---|---|---|
| **Assets:** | | | |
| **Real Estate:** | | | |
| U.S. Highway 39 Plant City, FL | 4,505,000 | 4,505,000 | 1 |
| **Personal Property:** | | | |
| Cash (on hand in accounts) | 97,330 | 97,330 | 2 |
| Cash - Tenant Lease Deposits | 48,392 | 48,392 | |
| Accounts Receivable | 117,395 | - | 3 |
| Utility Deposits | 5,067 | 5,067 | 4 |
| **Causes of Action:** | unknown | unknown | |
| **Total Funds Available:** | 4,773,185 | 4,655,789 | |
| **Estimated Administrative Expenses Claims - Chapter 11:** | | | |
| Trustee Fees | - | 10,000 | |
| Estimated Liquidation/Wind Down Costs | - | 15,000 | |
| Professional Fees | 50,000 | 50,000 | |
| **Total Administrative Expenses:** | 70,000 | 75,000 | |
| **Secured Claims:** | | | |
| BB&T | 6,000,777 | 6,000,777 | 5 |
| **Net Funds Available to Distribution to Unsecured Creditors:** | - | - | |
| **Unsecured Priority Claims:** | - | - | |
| **Tenant Lease Deposits[7]** | (48,392) | (48,392) | |
| **Unsecured Claims:** | (29,409) | (29,409) | 6 |
| **Net Available to Unsecured Creditors in a Liquidation:** | - | 0 | |

**Footnotes**

1 Value of the real estate is based on May 2010 appraisal by BB&T. BB&T has refused to turn over appraisal to Debtor and Debtor reserves all of its rights with respect to value of property.
2 Cash in Debtor's bank account as of February 21, 2011 net of outstanding checks.
   The Debtor is continuing to operate and the cash in the Debtor's accounts will be used to fund continuing operations.
   The Debtor will also receive additional funds from its business operations and such funds will be deposited into the Debtor's bank account.
3 Accounts receivable has been reduced for non-collectability by 50%.
4 Primarily utility deposits that should be recoverable or applied to any outstanding invoices.
5 Amount per Claim filed by BB&T; amount secured by lien on all assets of the Debtor.
6 Debtor still conducting claim review, $29,409 reflects the estimated allowed unsecured claims.
7 Depending on circumstances, not all of this will have to be returned.